SCRIPPS *v.* SWEENEY.

1. CONTRACTS—CORPORATIONS— OFFICERS AND DIRECTORS — FIDU-
CIARY RELATIONS—PUBLIC POLICY—SPECIFIC PERFORMANCE.

The execution of a contract between four of the directors and
stockholders of several corporations, holding a majority of
the stock in each, without the consent of other stockholders,
for purposes of personal gain, containing provisions for
the continued employment of one of the contracting parties
as manager at a fixed salary, and determining the business
policy of the several corporations, is contrary of public policy,
and may not be enforced specifically.

2. SAME—CONSTRUCTION—CORPORATIONS—VALIDITY.

The rule that in cases of doubt courts should favor a construc-
tion which upholds the validity of a contract cannot apply to
a case where the illegal intent of the parties is obvious.

3. SAME—GOOD FAITH—PUBLIC POLICY.

The invalidity of the contract is not changed by the fact that
the parties acted in good faith.

4. SAME—STOCKHOLDERS—EVIDENCE—PRESUMPTION.

Knowledge and acquiescence of the other stockholders cannot
be presumed from the fact that some of them were related to
the parties executing the agreement, and others were inti-
mately associated with some of them.

5. SAME—COMPROMISE—RELEASE—STOCK.

The execution of a new agreement by the manager who signed
the prior agreement, but who was subsequently compelled to
resign, and commenced a suit to secure rights under the orig-
inal contract, the substituted arrangement providing that
the suit should be thereby compromised and that he released
all claims against the other parties, but that the first con-
tract should in other respects remain in full force, consti-
tutes a release and settlement of all claims under the prior
agreement.

6. SAME—DISCHARGE BY CONSENT—INCONSISTENT ACTS.

In consenting that one of the parties to the original compact
should be permitted to purchase stock of the others in viola-

tion of its terms, which limited the sale to unanimous consent, where the contractors agreed thereto, and subsequently executed a new and inconsistent contract with a third person, they abrogated the first agreement.

7. EQUITY—RELIEF—CROSS-DEFENDANTS—PLEADING.

Equity may grant affirmative relief between defendants to a cross-bill who pray for no affirmative relief, under the rule that the court may do entire justice between the parties.

Cross-appeals from Wayne; Brooke, J. Submitted January 7, 1910. (Docket No. 9.) Decided March 5, 1910.

Bill by William A. Scripps against John S. Sweeney to remove a cloud upon the title to certain corporate stock. Defendant filed an answer in the nature of a cross-bill, making Edward W. Scripps and other parties defendant to the cross-bill, and prayed for the specific performance of certain contracts. From a decree for complainant, defendant and cross-defendant Edward W. Scripps appeal. Affirmed.

*Stevenson, Carpenter & Butzel,* for complainant.

*Keena, Lightner & Oxtoby* (*John C. Donnelly* and *Daniel F. Altland,* of counsel), for defendant.

*Jacob C. Harper, Jay W. Curts,* and *Standish Backus,* for cross-defendant Edward W. Scripps.

HOOKER, J. In the year 1887 John S. Sweeney and three brothers, named, respectively, James E. Scripps, George H. Scripps, and Edward W. Scripps, made the contract which is the subject of this suit. William A. Scripps is one of three residuary legatees of said George H. Scripps, now deceased, viz., himself, Ellen Scripps, and Edward W. Scripps, and has filed the original bill in this suit, praying the removal of a cloud from his title to certain stock, and copartnership interests, which he claims under

the will of said George H. Scripps. Said cloud is alleged to consist of a claim made by said John S. Sweeney, who is the sole defendant named in said bill, to a portion of said stock which is based on the contract before mentioned. Sweeney answered, denying complainant's right to the relief asked, and filed a cross-bill, and subsequently a supplemental bill, setting up his claim under said contract, and asking a decree adjudicating the validity and binding force of said contract against Edward W. Scripps and the representatives of said George H. and James E. Scripps, both of whom are deceased, and against William A. Scripps, personally, and for specific performance against the estates of George H. and James E. Scripps. The cause was heard on pleadings and proofs taken in open court, and defendant's cross-bill was dismissed, and the prayer of the complainant's bill was granted, and a decree entered declaring said contract null against all of the parties to the cross-bill. Appeals were taken by Sweeney and by Edward W. Scripps, against whom Sweeney's cross-bill had been taken as confessed. The other defendants to the cross-bill were, as their answer to said cross-bill indicated, in sympathy with the complainant W. A. Scripps, and are apparently satisfied with the decree. An outline of the facts proved will be necessary to an understanding of the questions of law and fact that are involved.

Previous to February 1, 1887, the four persons first named were mutually interested as stockholders in four corporations, engaged in the publication of four daily newspapers, viz., the Detroit Evening News, owned by the Evening News Association, the Cleveland Press, owned by the Scripps Publishing Company, the Cincinnati Post, owned by the Post Publishing Company, and the St. Louis Chronicle, owned by the Evening Chronicle Publishing Company.

The shares of stock of the respective companies were held as follows, on February 1, 1887:

|  | Chronicle. | Post. | Press. | News. |
|---|---|---|---|---|
| James E. Scripps _____ | 100 | 40 | 16 | 30 |
| Edward W. Scripps _____ | 280 | 110 | 14 | 1 |
| George H. Scripps _____ | 100 | 40 | 23 | 16 |
| William H. Little _____ | 20 | —— | —— | —— |
| Ellen B. Scripps _____ | —— | 10 | 4 | 2 |
| John S. Sweeney _____ | —— | —— | 16 | 1 |
| William A. Scripps _____ | —— | —— | 2 | —— |
| Anna Scripps _____ | —— | —— | 2 | —— |
| Nellie Scripps _____ | —— | —— | 3 | —— |
| Treasury Stock _____ | —— | —— | 20 | —— |
| Total No. of Shares _____ | 500 | 200 | 100 | 50 |
| Par value _____ | $100 | $500 | $1,000 | $1,000 |
| Amt. Cap. Stock _____ | $50,000 | $100,000 | $100,000 | $50,000 |

At that time—*i. e.*, February 1, 1887—the four signers
of the contract referred to were active in the management
of these papers. In December, 1886, Sweeney, who was
then devoting his attention principally to the Cleveland
Press, tendered his resignation as manager, professing a
desire to go into the newspaper business elsewhere for
himself, and expressed the intention of selling his "Press"
stock. James E. Scripps made Sweeney a proposition
to remain, which he declined on January 22, 1887. On
January 24, 1887, E. W. Osborne was employed to man-
age the Press in Sweeney's place. Subsequently, at the
suggestion of James E. Scripps, Sweeney went to see E.
W. Scripps at Westchester, Ohio, where the latter resided,
and they formulated a basis for an adjustment of their
differences, which had led Sweeney to leave the Press.
They afterward had another conference, and the outcome
was a written memorandum, called by the parties, "The
Westchester Agreement." It was signed by Edward W.
Scripps, George H. Scripps, and John S. Sweeney. Sub-
sequently these parties visited James E. Scripps at De-
troit, and on February 10th another document was signed
by the four, and on the next day a third paper was execu-
ted by them, and these two papers last mentioned are
called the "Quadripartite Agreement," and constitute the
document or documents upon which Sweeney bases his
claim. We insert copies of these writings at this point:

"Basis of adjustment of the newspaper business relations of Scripps Bros. and others:

"No. 1. The employment of J. S. Sweeney as business manager of the News at an annual compensation aggregating not less than $5,200.

"No. 2. The retention of J. S. Sweeney as managing director of S. P. C. for the present at a salary of $50 per week, the exception to his authority being only the employment and fixing salary of business manager, at least so long as E. W. Osborne shall be entitled to his place by contract previously made.

"No. 3. An arrangement to be made whereby the stock of the Scripps Publishing Co. shall not part from the hands of any of the present stockholders (not including E. B., W. A., Annie or Nellie) except to another, and that in case of death of any or all the Scripps brothers, so much of their stock as will give him a controlling interest shall be sold to J. S. Sweeney at a price not to exceed its earnings for the five years previous.

"No. 4. At the conclusion of the Osborne arrangement by reason of Osborne's failure or resignation, J. S. Sweeney shall have the option of resuming charge of the Press and to purchase the unissued twenty shares of stock at its assessed valuation.

[Following paragraph inserted in apparently E. W. S.'s handwriting, and afterwards erased:]

"Which shall not exceed $24,000 at the time when the News is satisfactorily organized and relinquished by J. S. Sweeney.

"No. 5. It is assented by all the signers of these propositions that it is unwise to establish a precedent at any time of granting bonuses, to vote back pay or make any other compensation for work done in the past.

"No. 6. The signers herein testify that mutual concessions have acquitted the companies and the individuals of any claim for money or other valuable consideration against them by companies or individuals.

"No. 7. A rule is established that all claims of the signers against any of the individual signers or companies shall be considered outlawed unless demanded within thirty days of their coming into existence and formally entered on the books to the time of the first subsequent meeting of the company interested.

"No. 8. The four papers controlled by the Scripps should, as far as possible, work in concert. When the ag-

gregate advantage exceeds the individual profit, the individual should concede. The eastern business should at least immediately be concentrated in one bureau.

"No. 9. In matters of journalistic and business policy each company should be independent, but the managing directors and editors should be entitled to all the business secrets and journalistic opportunities.

"No. 10. It is decided that the best policy for the future is to pay members of the company as well as others for their services by fixed salaries or commissions set annually in proportion to their services, and that this payment should be sufficiently liberal to remove all obligations of companies or individuals to sell stock at less than its value. Large salaries will permit the recipient to purchase such stock as they care to.

"No. 11. For the sake of encouraging young men to stay in or come into the concern, it should be considered that as the probability of natural heirs to come in soon enough is small, that the stock of all the companies should be in case of the death or retirement of any of the stockholders, so arranged that one-half shall be sold to the survivors in the company at a certain rate fixed annually, proceeds instead of the stock to go to legal heirs.

[Signed]            "E. W. SCRIPPS.
                    "J. S. SWEENEY.
                    "GEORGE H. SCRIPPS."

"Basis of adjustment of the newspaper business relations of the undersigned stockholders in the several Scripps newspapers:

"1. The employment of J. S. Sweeney as business manager of the News at an adequate compensation, the same to be not less than $5,200 a year.

"2. The retention of J. S. Sweeney as managing director of the Scripps Publishing Company for the present at a salary of $50 per week, the exception to his authority being only in the employ of and fixing salary of business manager, at least so long as E. W. Osborne shall be entitled to his place by contract previously made.

"3. An arrangement to be perfected whereby none of the newspaper stocks held by the parties hereto shall be sold except to parties to this agreement, and in case of the death of any of said parties, at least one-half of all his newspaper stocks shall be sold to the surviving parties at a valuation equal to the net earnings of the respective papers for the preceding five years, except in the case of the Cincinnati Post, the valuation of which is to be otherwise

arrived at should such sale of its stock take place prior to 1890.

"4. At the conclusion of the Osborne arrangement, either by reason of his failure or resignation, J. S. Sweeney is to have the option of resuming the business management of the Press, and in that event purchasing the unissued twenty shares of stock of the Scripps Publishing Co., at its appraised valuation.

"5. It is assented to by all the signers of these articles that it is unwise to establish a precedent at any time of granting bonuses to vote back pay or to make any other compensation for services rendered in the past.

"6. The signers herein testify that mutual concessions have acquitted the companies and the individual parties hereto of any and all claims for money or other valuable consideration on the part of the companies concerned or the parties to this instrument except such claims shall heretofore have been recognized and adjusted.

"7. A rule is established that all claims of any of the parties hereto hereafter arising and in any way connected with the business of the companies herein referred to must be presented for adjustment at the earliest practicable opportunity, otherwise the claims to be regarded as outlawed and void.

"8. The four papers controlled by the Scripps should, so far as possible, work in concert; when the interest of the combination outweighs the interest of any individual paper, the individual paper should give way. The eastern business should at least at once be concentrated in one bureau.

"9. In matters of journalistic and business policy each company should be independent, but the managers of each should be entitled to all the business secrets and journalistic opportunities of the others.

"10. It is decided that the best policy for the future is to pay members of the companies as well as others for their services by fixed salaries or commissions established annually in proportion to their services, and that this payment shall be sufficiently liberal to remove all obligation on the part of companies or individuals to sell stock at less than its value.

"Signed and sealed this 10th day of February, 1887.

"J. E. SCRIPPS.        [Seal.]
"GEO. H. SCRIPPS.        [Seal.]
"E. W. SCRIPPS.        [Seal.]
"J. S. SWEENEY."        [Seal.]

"Exhibit 18.

"In consideration of the covenants herein contained, the undersigned, James E. Scripps, George H. Scripps, Edward W. Scripps and John S. Sweeney, for themselves, their heirs, executors, administrators, and assigns, do each with the others covenant and agree as follows:

"*First.* That being in various amounts holders of the stock of the Evening News Association of Detroit, of the Scripps Publishing Company, of the Post Publishing Company of Cincinnati, Ohio, and of the Evening Chronicle Publishing Company of St. Louis, Mo., no one of the parties to this instrument shall sell, give away or otherwise dispose of any portion of the stock in any of the said companies now held or that shall be hereafter acquired by him to any person other than the parties to this instrument except by the unanimous consent of the parties hereto.

"*Second.* Upon the death of any of the parties to this instrument, to wit: James E. Scripps, George H. Scripps, Edward W. Scripps or John S. Sweeney, it is expressly agreed and ordained that one-half of the stock held by decedent in any of the above mentioned companies shall be sold to the surviving parties, signers hereto, the same to be distributed among them in equal shares or in such other proportions as they may agree upon between themselves. And it is agreed one with another that they will so purchase one-half the stocks of any deceasing signer hereof. And it is further agreed that the prices to be paid for such stocks shall be sums equal to the aggregate of the net earnings of each such stock, respectively, for the five calendar years preceding any such purchase and sale. Except that prior to 1890 the value of the stock of the Evening Chronicle Publishing Company and of the Post Publishing Company shall be otherwise determined by mutual agreement between the surviving parties hereto and the heirs, executors, or administrators of the party deceased.

"*Third.* It is agreed that from time to time other persons possessing skill in newspaper management may by unanimous consent of the parties to this compact be admitted to participation in it, in which case they shall be entitled to participation in all the rights, privileges and benefits herein provided, and shall be subject to all the obligations in all respects the same as the original signers hereto.

"*Fourth.* It is further agreed that should any of the parties to this compact and agreement die leaving male children that at least one of such children descendant of each of said subscribing parties shall, at suitable age, be admitted to participation in the rights, privileges, benefits and obligations hereby created and provided.

"In witness hereof, we have hereto set our hands and seals in the city of Detroit this eleventh day of February, in the year of our Lord, 1887.

"James E. Scripps.    [Seal.]
"Geo. H. Scripps.    [Seal.]
"E. W. Scripps.    [Seal.]
"John S. Sweeney."  [Seal.]

As already indicated, the original bill in this cause was filed by reason of a claim set up by Sweeney to the right to purchase under and according to the terms of the Quadripartite Agreement certain stock in the Scripps Publishing Company owned by George H. Scripps previous to his death, which occurred before the filing of the bill. The cross-bill was filed by Sweeney to enforce such claim against the estate of George H. Scripps. James E. Scripps was made a party defendant, but he died soon after the cross-bill was filed, when a supplemental cross-bill was filed, claiming relief against his representatives similar to that claimed against the estate of George H. Scripps. The right of Sweeney to purchase a portion of the stock held by George H. and James E. Scripps, under the alleged contract, is therefore the crucial question in the case.

At the outset we are confronted by the claims of the respective parties in relation to the mutual obligations created by the Quadripartite Agreement. The complainant asserts that such agreement consists of two instruments; defendant's contention being, as we understand it, that the basis of agreements, made February 10th, is no part of the contract ultimately made February 11th. The former instrument purports to be a memorandum of the "basis of adjustment of the newspaper business relations of the parties." Its signature by the four parties made the further agreement possible. Its provisions were to be

carried out, and an attempt was made to carry them out, and Sweeney has tried to enforce them by legal proceedings. There is no doubt in our minds that each party who signed the paper of February 11th found his inducement to do so in the provisions contained in the writing of the previous day, which he supposed these writings gave him the right to have carried out. Defendant's brief says as much. The earlier of the two was *called* an agreement, as is shown by paragraph 3. It was signed by the four parties, and was to take effect only when the same persons should execute the writing of February 11th. That instrument was signed and the two instruments became effective as the agreement of the parties as one contract, called the "Quadripartite Agreement." Was this agreement void as against public policy?

We have hitherto shown that this contract was made by four out of nine persons interested in the subject-matter. It was clearly an attempt to create an obligation binding upon the four to shape the policy of four corporations along lines agreed upon, and for their own personal aggrandizement. Section 1 required the employment of Sweeney as business manager of the News, and section 2, his employment as managing director of the Press. The former fixed his salary for his services to the News at "an adequate compensation," with $5,200 as a minimum, the latter fixed his salary for services to the Press at $50 a week ($2,600 a year) as long as one Osborne should be entitled, by a pre-existing contract, to remain with the Press. Section 4 provided that at the conclusion of Osborne's management Sweeney should have the option of resuming the management of the Press, from which he had just resigned. Here then was a personal agreement, made by the parties, which bound them to see to it that the News Association and the Scripps Publishing Company carry out the agreement thus made, whether for the best interests of the corporation, respectively, or not, and to pay certain compensation whether it should be excessive or not, and whether other

stockholders approved or not. This they could do, as they held a majority of the stock in each corporation. Again in section 6 we find what we understand to mean that they had agreed to settle all claims that the several companies may have had against any and all of such parties. Again, in section 8, they agree that the four papers should, so far as possible, work in concert, and that, " When the interests of the combination outweigh the interests of any individual paper the individual paper should give way," and that the eastern business should at once become concentrated in one bureau. In section 9 it was agreed that:

" In matters of journalistic and business policy each company should be independent, but the managers of each should be entitled to all the business secrets and journalistic opportunities of the others."

Again section 4 contains an agreement to not only allow Sweeney to resume the management of the Press, but also, in such event, to allow him to buy 20 shares of the stock of the Scripps Publishing Company, at its "appraised valuation." There were several stockholders who were not parties to this agreement: Mr. Little, of the Chronicle; Ellen Scripps, of the Post, Press, and News; William A., Anna and Nellie Scripps, of the Press. Of these there is proof tending to show that Ellen Scripps refused to join in and protested against such an arrangement, and the others are not shown to have assented to it. It is easy to understand that self-interest would be likely to influence one or another of the four directors in making and carrying out such an arrangement. As to Sweeney and E. W. Scripps, there could not well be more cogent proof that in making the agreement, and in what they did and sought to do under it personally and as directors, their own personal interests were always uppermost. Sweeney insisted on buying the 20 shares at the price of $24,000, alleged by him to have been agreed upon, although they were worth a much larger sum. He urged and insisted on salaries, which even his associates in the contract

would not permit, claiming that it had been agreed between them that he should have them. He afterwards sold 16 shares of the Press stock for $120,000. These agreements were void as against public policy.

In *West* v. *Camden*, 135 U. S. 507 (10 Sup. Ct. 838), the plaintiff agreed to serve as vice president of a corporation, upon an agreement by another stockholder and director that he could and would cause plaintiff to be continued in said office at a salary agreed upon. Being removed by the board, he brought an action upon the agreement. We quote the following:

"If they find that [by] the alleged contract between the plaintiff and the defendant that the said plaintiff should have permanent employment as an officer of the Baltimore United Oil Company, at a salary of not less than $5,000 a year, or as much as any other officer of said company received, was made in contemplation that the defendant was to be an officer of said company, and to control a majority of its stock, and that, by the use of his official position and of the control of said ownership of stock he was to retain said plaintiff in office and fix his salary, as admitted by the said plaintiff, then their verdict must be for the defendant upon the issues joined in this case."

The plaintiff excepted to such instruction. That instruction was based upon the view that; on the facts stated in it, the alleged contract was void as against public policy. On this point the court said:

"There is no allegation or proof that there was at any time such a contract for permanent employment directly with the company, or that the existence of such a contract with defendant was known to all the stockholders of the company, so that it resulted, if the contract be upheld, that whenever the question of retaining the plaintiff in the company's service at $5,000 a year came to be voted on, the defendant's vote was to be influenced by the fact that he was to be liable to the plaintiff in large damages unless the company retained him. Either the company must pay him $5,000 a year, or the defendant must make it good to him out of his own pocket. This state of facts serves clearly to bring the case within the principle of the

ruling in *Fuller* v. *Dame*, 18 Pick. (Mass.) 472, and *Guernsey* v. *Cook*, 120 Mass. 501, that is to say, it was a contract the purpose and effect of which was to influence the defendant as a stockholder and officer of the company 'in the decision of a question affecting the private rights of others, by considerations foreign to those rights,' and the defendant, by the contract, was placed under direct and very powerful 'inducement to disregard his duties to other members of the corporation, who had a right to demand his disinterested action in the selection of suitable officers.' He was to be in relation of trust and confidence which would require him to look only to the best interests of the whole, uninfluenced by private contracts. We think this salutary rule is applicable in this case, notwithstanding the alleged contract was not corruptly made for private gain on the part of the defendant. There were other stockholders in the company. The defendant and the Standard Oil Company, for whose benefit, it is alleged, the contract was made, were not all the stockholders and it seems to us that it was certainly the right of those other stockholders to have the defendant's judgment, as an officer of the company, exercised with a sole regard to the interests of the company."

Mr. Justice Blatchford held:

"We think that under no circumstances could the plaintiff recover in this action, for the reason that the alleged contract was void as against public policy, and that the first instruction to the jury was correct.  *  *  * The agreement alleged to have been made was one on the part of the defendant, whereby he might be required to act contrary to the duty which, as an officer of the Baltimore United Oil Company, he owed to that company and to the stockholders other than the plaintiff. The same rule which is applicable to the case of a public office applies to the present case, although it does not appear that the defendant was to receive direct personal pecuniary compensation or gain for what he was to do.  *  *  *

"The principle involved is well settled in regard to public employments. *Meguire* v. *Corwine*, 101 U. S. 108, 111; *Oscanyan* v. *Arms Co.*, 103 U. S. 261, 272, 273. The same doctrine has been applied to the directors of a private corporation, charged with duties of a fiduciary character to private parties, on the view that it is public policy to secure fidelity in the discharge of such duties.

*Wardell* v. *Railroad Co.*, 103 U. S. 651, 658; *Woodstock Iron Co.* v. *Extension Co.*, 129 U. S. 643 (9 Sup. Ct. 402), and cases there cited, especially *Fuller* v. *Dame*, 18 Pick. (Mass.) 472, 483. See, also, *Guernsey* v. *Cook*, 120 Mass. 501, and *Woodruff* v. *Wentworth*, 133 Mass. 309, 314.

" We think this principle is equally applicable, on the ground of public policy, although there was not to be any direct private gain to the defendant; for, as was said by the circuit court in this case, it was the right of the other stockholders in the Baltimore United Oil Company, 'to have the defendant's judgment, as an officer of the company, exercised with a sole regard to the interests of the company.' A personal liability for damages on the part of the defendant, in case the plaintiff should be removed after an agreement of the character alleged, was calculated to be a strong incentive to the defendant to act contrary to the true interests of the company and of its other stockholders. *Bliss* v. *Matteson*, 45 N. Y. 22; 1 Morawetz on Private Corporations, §§ 516, 519."

In the case of *Robison* v. *McCracken*, 52 Fed. 729, it was said by Shipman, J.:

" The defendants invoke the aid of the principle which denounces the action of directors of a corporation who, professing to be its agents, and to be contracting in its behalf, secretly agree for a private and personal benefit to themselves, or agree to sell their official influence for personal gain, and assert the just doctrine that 'no action can be maintained on a contract the consideration of which is either wicked in itself or prohibited by law.' *Armstrong* v. *Toler*, 11 Wheat. (U. S.) 258. The decisions of the courts of the United States have been most strenuous in demanding that the directors of corporations shall act disinterestedly in contracts which they make in behalf of the corporation for which they act, and in setting aside tainted contracts which the corporation refused to abide by, or in setting aside contracts between a director or an agent and a third person for the sale of official influence. *Wardell* v. *Railroad Co.*, 103 U. S. 651; *Thomas* v. *Railroad Co.*, 109 U. S. 522 (3 Sup. Ct. 315); *Woodstock Iron Co.* v. *Extension Co.*, 129 U. S. 643 (9 Sup. Ct. 402); *West* v. *Camden*, 135 U. S. 507 (10 Sup. Ct. 838); *Providence Tool Co.* v. *Norris*, 2 Wall. (U. S.) 45."

Again in *Singers-Bigger* v. *Young*, 166 Fed. 85, 91 C. C. A. 513, Adams, J., stated the rule as follows:

" If the contract of employment obligated the defendant to assist plaintiff to control the corporate action of the company in the important particular under consideration, regardless of his duty as a director to represent and act for all the stockholders alike, it would have been against the policy of the law of Colorado under which the amusement company was incorporated. This law confides the business management of such corporations to boards of directors (Mills' Ann. Stat. § 481), and requires a majority of them to authorize any proposed act (1 Thompson on Corporations, § 726). A contract of the character just suggested would tend to deprive the stockholders of the benefit of defendant's independent and impartial judgment, and subordinate the interests of the corporation, which his duty required him to serve, to the individual interests of his employer, and would be contrary to public policy and void. *Wardell* v. *Railroad Co.*, 103 U. S. 651; *West* v. *Camden*, 135 U. S. 507, 520 (10 Sup. Ct. 838). Whatever other obligations defendant owed to plaintiff by reason of the contract of employment, he owed her nothing with respect to his duty as a director. That was conclusively determined by law, and could not be added to or lessened by a personal contract with one of the stockholders."

In *Jones* v. *Williams*, 139 Mo. 1 (39 S. W. 486, 40 S. W. 353, 37 L. R. A. 682, 61 Am. St. Rep. 436), the rule was recognized:

"But it is said that the contract is against public policy and void, for the reason that it couples with a sale of stock in the corporation an agreement to give to the purchaser a position for five years at a large salary, and, in addition, the position of director and president of the corporation.

" Counsel cite many cases in support of their position. It is undoubtedly true that an agreement by one stockholder for the sale, directly or indirectly, of an office in a corporation, or of a permanent position therein, 'would be against public policy and void,' though the contracting stockholder had shares sufficient in amount to give him control in the election of officers. By such agreement he might be required to act contrary to the duty he owed the

company and other stockholders. *West* v. *Camden*, 135 U. S. 507 (10 Sup. Ct. 838).

"Each shareholder in the corporation has a right to rely upon the judgment of all the others, in the election of directors and officers, and any agreement which puts it out of his power to exercise such judgment is against public policy."

See *McGuffin* v. *Coyle*, 16 Okl. 648 (85 Pac. 954, 86 Pac. 962, 6 L. R. A. [N. S.] 524). Our own case of *Wilbur* v. *Stoepel*, 82 Mich. 344 (46 N. W. 724, 21 Am. St. Rep. 568), seems to us conclusive of the rule in this State, which accords with that announced in *West* v. *Camden, supra*.

Counsel for the defendant appear to concede the rule of law relied on by the complainant, but deny its application for several reasons:

(1) That the contract is susceptible of a construction which will remove the objection made, and that under the well-settled rule we must give it such construction if possible.

(2) That the claim of a violation of public policy cannot be sustained when the agreement was made in good faith.

(3) Or where it has been carried out fairly by one of the parties in reliance upon it.

(4) Or where the stockholders not parties to it raised no objection thereto.

(5) Or where the stockholders not parties to the agreement were, by reason of family relations or otherwise, practically represented by the signers of the agreement.

1. We recognize the rule that, in a case of doubt, courts should favor a construction which upholds the validity of the contract, but such a rule cannot apply to a case where the intent of the parties is obvious. A court cannot do violence to the plain meaning of words and the clear intent by making a contract for the parties, under the fiction of a construction. Evidently it would well serve the purposes of Mr. Sweeney and E. W. Scripps (who seem from the record to be in harmony) if we should decide that the writing of February 11th alone is the contract, while that of the previous day is a mere declaration

of a policy, or at most "a gentlemen's agreement," and separable from the agreement of February 11th. Whatever we call it, there can be no doubt that the latter paper was made in consequence of the arrangement that these parties should, as directors in four corporations, support the measures, and adhere to the policy therein declared (both subjects for the boards to control); neither being the proper subject of private contract between the directors to the exclusion of other directors or stockholders. This was invalid, because at the very least it subjected the contracting parties to temptations to disregard their duties as directors, who had no right to consider their own personal interests as against the welfare of the corporations.

2, 3. Nor is the validity of this agreement to be tested by the matter of good faith or performance by one party, though it might safely be made to depend on that rule under the proof. Grant that it was in good faith in so far as good faith depends upon a belief in the legality of the arrangement, yet the fact remains that the intended effect was that these parties should themselves shape the policy, and make and carry out measures for the personal pecuniary benefit of some, if not all, of their number, putting the possibility of any effective opposition to either by other stockholders out of the question so long as they should carry out their "gentlemen's agreement," a class of contracts which seldom find their way into courts, but under which the public suffers many wrongs. A void compact is just as effective as a valid one so long as the parties perform it, and when clearly against public policy on its face, it can be made no basis for relief, whether made in good faith or not. Such a case was *Harris* v. *Chamberlain*, 126 Mich. 280 (85 N. W. 728). This contract has not been fully performed by any of the parties.

4, 5. We cannot presume consent to the contract by the other five stockholders. We have no doubt that, where all stockholders agree upon a valid policy, upon a sufficient consideration, contracts may be made that are not against public policy. We are asked to infer both knowl-

edge and acquiescence from the relationship of the Scripps, and as to Little from the fact that he was closely associated with E. W. Scripps, and probably knew of the contract and did not object.    None of these are produced as witnesses, and for proof we are left to two letters written by E. W. Scripps, from one of which it is perhaps inferable that Ellen Scripps did know of the contract at some time, and from the other that she protested against it most vigorously when informed of it and asked to join in it.    We repeat that the evidence is convincing to us that this contract had its origin in the desire of E. W. Scripps and Sweeney to make a contract which should ultimately, if not speedily, give them control or management of these newspapers and increased holdings therein by reason of the early death of James E. Scripps, which then seemed to be assumed. This is easily inferable from the testimony and letters of Sweeney and E. W. Scripps.    It appears that the attempted management of the papers, especially the News, by Sweeney and E. W. Scripps, immediately after the making of the Quadripartite Agreement, ended in a quarrel, and the discharge or withdrawal of Sweeney from such management.    He insisted, however, that he was entitled to purchase the 20 shares of the Press stock for $24,000, under the contract, upon the claim, as we understand it, that a secret promise was made to him by Edward W. Scripps, before Sweeney signed it, to sell the stock to him for that sum as soon as James E. Scripps should go to Europe, which as directors they could do. Edward W. did not deny to James E. Scripps the collusive agreement with Sweeney, or Sweeney's reliance upon it, as an inducement to his signature to the instruments of February 10th and 11th, and it appears from a letter from him to James E. Scripps that he knew when he made it that Sweeney could not enforce it, and that it was for Sweeney to take care of himself.    Doubtless Sweeney knew it also, but had simply relied upon E. W. Scripps' promise as another "gentlemen's agreement."

Disregard of the Tripartite Agreement.   In 1890
Sweeney began a suit in Detroit to compel the specific
performance of this provision of the Quadripartite Agree-
ment.   Apparently he was opposed by the other three
signers.   Bateman, a counselor in Cincinnati, had given
Edward W. an opinion that the Quadripartite was void
for the reasons alleged in this suit.   That opinion had
been shown to the other defendants, and Sweeney's coun-
sel had advised him practically to the same effect, except
as to the right to purchase stock, which he thought might
be sustained.   Hence the suit.   It was then that he re-
signed (under pressure) or was discharged from his posi-
tion in the News.   A settlement was finally agreed upon
and put in writing.   It was signed by all; James E.
qualifying his acquiescence by a writing appended after
the others had signed.   This settlement involved a sale by
Sweeney to George H. Scripps of his 16 shares in the
Press, for $120,000.   The writing follows:

"DETROIT, MICHIGAN, June 27, 1892.
"In consideration of John S. Sweeney waiving all
causes of action and claims for damages, stock or
money alleged to be due him from the Scripps Publish-
ing Company, James E. Scripps, George H. Scripps
and Edward W. Scripps and what is known to the
parties as the New York Bureau, it is hereby under-
stood and agreed that the said George H. Scripps here-
by agrees to purchase of the said John S. Sweeney his six-
teen shares of the stock of the Scripps Publishing Com-
pany, and in consideration of the above adjustment, and
of said stock, he agrees to pay to said John S. Sweeney
the sum of one hundred and twenty thousand dollars
($120,000) and he agrees to pay the same as follows, that
is to say :   He is to pay the sum of ten thousand dollars
($10,000) in cash and execute and deliver to said John S.
Sweeney notes for the aggregate sum of one hundred and
ten thousand dollars ($110,000) payable in quarterly in-
stallments during the ensuing five years with interest at
six per cent. payable annually, and said notes to be secured
by the indorsements of James E. Scripps and Edward W.
Scripps.   Said payment of ten thousand dollars ($10,000)
and the execution and delivery of said notes is to take

place immediately upon the demand of the said John S. Sweeney at any time within thirty days from this date. In case the said George H. Scripps shall not be accessible to the said John S. Sweeney it will be sufficient for him to deposit said demand in the postoffice in the city of Detroit, addressed to the said George H. Scripps at 1315 Woodward avenue in said city, duly stamped.

"It is further understood that if said John S. Sweeney does not make said demand within the thirty days that he waives all right to sell said stock to said George H. Scripps but without vacating or any prejudice to the settlement and adjustment above made.

"In consideration of the premises and the agreement of said George H. Scripps to purchase said stock upon the basis above set forth the said John S. Sweeney agrees that he will not engage in the newspaper business or enter into any newspaper employment in either the cities of Cleveland or Detroit for the period of his natural life unless he meets with serious financial reverses and then not without first giving the Scripps Publishing Company and the Detroit Evening News Association the option of his services on one of the papers at a salary of $150 a week.

"It is thereby understood and agreed that the said George H. Scripps hereby in consideration of the premises further agrees that he will resell said sixteen shares of stock to the said John S. Sweeney for the sum of one hundred and twenty thousand dollars ($120,000) in cash or by surrender of his notes remaining unpaid upon the demand of John S. Sweeney at any time within three months after said sixteen shares of stock shall have been transferred to the said George H. Scripps by the said John S. Sweeney, it being understood that the said shares of stock shall be transferred by said John S. Sweeney upon the payment of the ten thousand dollars ($10,000) and the execution of the notes for one hundred and ten thousand dollars ($110,000) as herein provided for.

"Upon the execution of this contract by George H. Scripps and John S. Sweeney and the indorsement thereon of the approval of James E. Scripps and Edward W. Scripps, the said John S. Sweeney agrees to discontinue and dismiss as fully compromised and settled the suit in chancery now pending in the circuit court for the county of Wayne, it being understood that the claim involved in said suit and all other claims and demands whatsoever on the part of said John S. Sweeney against the said George

H. Scripps, James E. Scripps, Edward W. Scripps, the Scripps Publishing Company and the Detroit Evening News Association are hereby fully released and discharged, it being expressly understood, however, that the two agreements of the tenth and eleventh of February, 1887, shall, in all other respects, remain in full force and effect.

"GEORGE H. SCRIPPS.

" E. W. SCRIPPS.

"JOHN S. SWEENEY.

" I approve the above except as to the last clause referring to the agreements of Feb. 10, and 11, 1887.

"JAMES E. SCRIPPS."

Upon the hearing John S. Sweeney produced a copy of the writing evidencing the settlement, with the underwriting erased, by a line drawn through it.   On the other hand, the copy in the hands of George H. Scripps, produced by his executor, E. W. Scripps, had no erasure.   An attempt was made to prove that James E. Scripps was persuaded to erase it after signing, but we think that this failed, and find the fact to be that the erasure was without the knowledge or consent of James E. Scripps.

It is contended that this settlement and sale to George H. of the Press stock ended all rights in John Sweeney under the Quadripartite Agreement:   (a) By the express terms of the settlement; (b) By its violation of the Quadripartite.

(a)  We are of the opinion that the last paragraph shows an intention on the part of Sweeney to release all claims under the Quadripartite Agreement, and that the final provision was not intended to qualify such release.   That it was the handiwork of Edward W. and possibly George H. for their own purposes may reasonably be surmised, as the instrument on its face shows that it was prepared in the absence of James E., whose signature of approval was required by its terms, and who qualified his approval in the way stated.   If the rights of Sweeney in this litigation were all that is involved, it would be unnecessary to discuss further the effect of this sale and indorsement.

(*b*) It is claimed by complainant's counsel that the sale of Sweeney's interest in the Press without the unqualified consent of James E. Scripps was a violation of the Quadripartite Agreement, which constituted an abandonment of all claims under it as to James E. Scripps by all of the other parties who acquiesced in the transfer, without such consent.   This would necessarily depend upon the construction to be given to the Quadripartite.   It is contended by defendant's counsel that section 1 of the instrument of February 11th permitted the sale to any one of the parties, without approval by the other.   This is not in accord with its literal provision, which is, in substance, that stock shall not be sold to any one other than the other parties (collectively), except by unanimous consent.   But if it be conceded that the language is open to another meaning, then we must bring to bear on the question the light of the object in view and the effect of a different construction.   The object is not in doubt.   It was to subject one-half of the stock of a deceased member to purchase and division.   To permit James E. Scripps who was the oldest, or George H., who was the first to die, to convey his stock to E. W. or Sweeney would permit such person to postpone such division, practically denying to others the benefit of their contract.   This satisfies us that unanimous consent was essential under the contract. Moreover, the parties appear to have so understood it, for they acted upon that assumption, and sought to get the consent of all to Sweeney's sale, and, being unable to do this, still carried out the settlement and sale.   Nor was this all, for Edward W. and George H. proceeded to deal with the subject-matter in a way that was inconsistent with the continued existence of the Quadripartite Agreement as a valid and binding contract.   Sweeney went into business elsewhere, paying no more attention to these corporations, unless it be to act perfunctorily as secretary of the News, and to draw his dividends on his one share of News stock.   George H. devoted his attention to the

Press for a time, while Edward W. looked after the other two papers. Ultimately both of them united with Milton A. McRae in forming a copartnership known as the Scripps-McRae League.

The following is a copy of the agreement:

"These articles of copartnership entered into this 15th day of June, 1895, between George H. Scripps, Edward W. Scripps and Milton A. McRae, witnesseth, that

"Whereas the said George W. Scripps owns sixteen fiftieths and Edward W. Scripps owns one fiftieth, making in all seventeen fiftieths of the stock of the Evening News Association of Detroit; George A. Scripps owns four twentieths and Edward W. Scripps owns eleven-twentieths, making fifteen twentieths of the stock of the Post Publishing Company of Cincinnati, Ohio; George H. Scripps own four twenty-fifths, Edward W. Scripps owns two hundred and four five-hundreths, and Milton A. McRae owns five twenty-fifths of the capital stock of the Evening Chronicle Publishing Company of St. Louis; George H. Scripps owns thirty-nine eightieths and Edward W. Scripps fourteen eightieths of the capital stock now issued of the Scripps Publishing Company, now engaged in the publication of the Cleveland Press of Cleveland, Ohio; George H. Scripps is the owner of one fifth of the stock of the company owning and publishing the Detroit Tribune, known as the Tribune Printing Company; and George H. Scripps is the owner of four twenty-fifths, Edward W. Scripps of forty-four one hundredths and Milton A. McRae one fifth of the stock of the Scripps-McRae Publishing Company of Covington, Kentucky; and

"Whereas, the said George H. Scripps and Edward W. Scripps are desirous of securing permanently the services of the said Milton A. McRae for the companies in which they have said several interests, as above stated.

"It is agreed:

"1. That the said George H. Scripps and Edward W. Scripps and said McRae shall and do, for the purpose aforesaid, enter into a partnership under the name and style of the Scripps-McRae League, for the period defined as follows:

"This partnership shall be and continue during the lives of the parties thereto, and during the life of the last survivor thereof except as hereinafter provided.

"In the case of the death of Milton A. McRae, said partnership shall cease as to his interest, except that if it occur within ten years from the date hereof, the interest of his estate in the partnership shall continue for five years thereafter for the use and benefit of his estate. And thereafter during the life of either Edward W. or George H. Scripps, the partnership shall continue as between them, subject to all the conditions of this agreement, and at the expiration of either of the periods hereinbefore provided, as to the interests of said McRae the partnership shall be settled as to him and his estate, and his interest shall be paid and his stock transferred to his legal representatives without affecting the continuance of the partnership as between the said E. W. and George H. Scripps. The death of either of said partners before the expiration of the term of partnership hereinbefore provided, either as to the three or as to the said E. W. or G. H. Scripps, shall not terminate the partnership herein provided for, but the same shall be continued for the use of the several members or their estates herein provided, during the term provided for.

"2. That the several stocks now owned, as aforesaid, by the said George H. Scripps, Edward W. Scripps, and Milton A. McRae and such other stocks as they may hereafter acquire in said corporations, or in other corporations succeeding to the business now conducted by said corporations, shall be transferred by each to Edward W. Scripps, as trustee, to be managed and controlled, in trust, for the purposes of this partnership, and after the termination of this partnership, for the partners respectively, aforesaid, now so owning said stocks, or who may acquire stocks as aforesaid, on the following conditions, viz., that he shall hold said trust so long as he shall so use and vote the same and direct the management of said companies, in which the parties hold a controlling interest, as to secure to the stockholders thereof, a profit available for dividend of not less than fifteen per cent. of the gross receipts, and upon failure thereof, the remaining partner or partners, as the case may be, may be entitled to require of him to resign said trust and transfer the stock held in trust to a trustee that may be chosen by a majority of the partners then constituting the partnership or their legal representatives. And in case of his death or resignation, his successor shall be chosen in the same way.

"3. The said Edward W. Scripps and George H. Scripps shall render such service, in the conduct of the business of said partnership as they may assume and from time to time agree to perform therein, and shall accept and perform the duties of such offices of the said corporations to which they may be elected during the continuance of this partnership. And the said McRae shall give and devote his services wholly to the business of the companies aforesaid and to the duties of such offices as he may hold in the corporations in which such stocks may be held by said partners, as aforesaid.

"4. The said partnership shall be entitled to receive and collect all dividends made upon the stock aforesaid, and to have and receive all the profits earned by said corporations for and on behalf of said stock; and the said partners, respectively, shall be bound to pay or account to the partnership for all salaries, or other compensations by them received from the corporations aforesaid, for services by them rendered, official or otherwise; which said profits, income, dividends, salaries and compensation shall be and constitute and (the) earnings of the partnership hereby formed, and shall be divided among the parties hereto in proportions, as follows, to wit:

"Two-fifths ($\frac{2}{5}$) thereof to Edward Scripps.

"Two-fifths ($\frac{2}{5}$) thereof to George H. Scripps, and

"One-fifth ($\frac{1}{5}$) thereof to Milton A. McRae.

"5. Transfers of not exceeding one share to any one person may be made in trust to qualify such person to be elected director in any of said corporations.

"6. A majority of the three partners, shall be authorized to determine all questions as to the conduct of partnership business.

"7. It is agreed and each of the parties hereto do severally bind themselves to provide, by will duly executed for the continuance of this partnership for the full term thereof and to authorize and direct their executors, severally, to do all and every act needful therefor.

"8. All of the parties hereto do covenant and bind themselves to each that they will, at the expiration of the term of this partnership, retransfer to each or to their legal representatives severally the stock so transferred to said partnership, as hereinbefore provided, unimpaired and unincumbered by any act of each of said parties severally or jointly with the others.

"In witness whereof, the said parties have hereunto set their hands in triplicate.

[Signed]	"E. W. SCRIPPS.
[Signed]	"GEO. H. SCRIPPS.
[Signed]	"MILTON A. McRAE.

"Witness:

[Signed]	"CHAS. J. STEIN.
[Signed]	"D. C. WRIGHT.
[Signed]	"M. M. STUART."

"Whereas: In the conduct and management of the various newspapers, the controlling stock of which is owned by the Scripps-McRae League, it has become necessary to establish, own and conduct a Press Association for the gathering of news for said newspapers, said Press Association Company having been duly incorporated under the laws of the State of Ohio, the controlling stock of which having been purchased and the company to be operated and accounted for as a part of the partnership property and interests of the said Scripps-McRae League:

"Now, therefore, this further agreement between the members of said firm, the said E. W. Scripps, George H. Scripps and Milton A. McRae, entered into this 4th day of June, 1897, witnesseth:

"That it is hereby agreed that the purchase above referred to shall be held and owned, and the stock thereof or other evidence of interest therein held in trust and be subject in all respects to the agreement of partnership made between the parties hereto and dated the 15th day of June, 1895, and said partnership articles shall in all respects, as to the term of their partnership interest in said property, and the holding and management thereof, apply to and govern the said parties and said property, as fully as though the same were embraced in said original articles of partnership; and said stock in said corporation, or said interest in said partnership shall be transferred to and held in trust by the trustee provided by the said articles of partnership.

"The amount of said stock and interest in the property, so purchased, shall be owned by said parties subject to said trust and paid for by them in the proportion they have in the profits of the partnership, as defined by the partnership articles aforesaid; that is to say, two-fifths by Edward W. Scripps, two-fifths by George H. Scripps, and one-fifth by Milton A. McRae. The division of

profits and the amounts thereof shall be governed by the earnings of the business, but shall be as large and as frequent as the said earnings and business interest of the property so purchased will allow.

"Signed on the day aforesaid.

             [Signed]   "E. W. SCRIPPS.
             [Signed]   "GEO. H. SCRIPPS.
             [Signed]   "MILTON A. McRAE.

"Witnesses:

    [Signed]   "M. M. STUART.
    [Signed]   "H. H. HOBBS.
    [Signed]   "CHAS. J. STEIN."

"Additional Contract.

"Whereas, in pursuance of a resolution passed December 30, 1896, the Scripps-McRae League purchased the controlling interest in a newspaper in Kansas City, now known as the Kansas City World, to be operated and accounted for as a part of the partnership properties and interests of the said Scripps-McRae League:

"Now, therefore, this further agreement between the members of said firm, the said E. W. Scripps, George H. Scripps and Milton A. McRae, entered into this second day of June, 1897, witnesseth:

"That it is hereby agreed that the purchase above referred to, shall be held in trust and be subject in all respects to the agreement of partnership made between the parties hereto and dated the 15th day of June, 1895; and said partnership articles shall in all respects, as to the term of their partnership interest in said property, and the holding and management thereof, apply to and govern the said parties and said property, as fully as though the same were embraced in said original articles of partnership; and the said stock in said corporation, or said interest in said partnership shall be transferred to and held in trust by the trustee provided for by the said articles of partnership. The amount of said stock and interest in the property, so purchased, shall be owned by said parties subject to said trust and paid for by them in the proportion they have in the profits of the partnership, as defined by the partnership articles aforesaid; that is to say, two-fifths by Edward W. Scripps, two-fifths by George H. Scripps and one-fifth by Milton A. McRae. The division of profits and the amounts thereof shall be governed by the earnings of the business, but shall be as large and as

frequent as the said earnings and business interests of the property so purchased will allow.

"Signed on the day aforesaid.

| [Signed] | "E. W. SCRIPPS. |
| [Signed] | "GEO. H. SCRIPPS. |
| [Signed] | "MILTON A. McRAE. |

" Witnesses:

| [Signed] | "JNO. M. SCHMID. |
| [Signed] | "E. A. WOOD. |
| [Signed] | "M. M. STUART." |

The shares of George H. Scripps in the News were reissued in July, 1896, to Edward W. Scripps, trustee, in accordance with said contract; the new certificates being signed by James E. Scripps as president, with the knowledge and acquiescence of Sweeney. It is contended that this was not inconsistent with the Quadripartite. *First.* The object stated was to secure the services of McRae for the companies in which the parties had several interests. *Second.* It provided for the employment of McRae, and authorized and required Edward W. Scripps, trustee, to use and vote the stock and direct the management of said companies for the benefit of the stockholders. That was inconsistent with the spirit of the Quadripartite, which undertook to provide for the control and management by the four, instead of by a combination of two or more of them. So, whether or not we should be able to say that in making the McRae contract the parties had succeeded in avoiding the charge of its being in violation of the Quadripartite (a question that we do not decide), we are of the opinion that it is cogent evidence that the parties to it regarded the Quadripartite as a nonexisting compact. We are of the opinion that these parties should be estopped to assert the existence of the Quadripartite as a foundation for a right to a share of the stock in controversy. This is conclusive of Sweeney's claim, and also sustains complainant's prayer, and upon this record we must sustain the decree granting the prayer of complainant's bill, as against Sweeney, and the decree dismissing the cross-bill in favor of all, unless it be Edward W., who allowed the cross-bill to be taken as confessed, and has appealed.

A claim is made, however, on behalf of Edward W. Scripps, appellant, that complainant is not entitled to relief against any one but Sweeney, for the reason that he asked relief against no one else, and made Sweeney the only defendant, and that Sweeney's cross-bill cannot support such relief, and that the decree ordering a perpetual injunction against Edward W. Scripps was erroneous, as also was an adjudication that the stock of James E. Scripps was not subject to any claim by Edward W. Scripps. It is clear that complainant's bill will not support any relief against Edward W. Scripps, for he was not made a party to it. Whatever relief complainant may claim against him must be based on the cross-bill, to which he was made defendant, and subsequent pleadings. The cross-bill makes claim to the validity of the Quadripartite, and to rights and relief upon it. Edward W. Scripps was a party defendant. He, only, allowed it to be taken as confessed; William A. Scripps, for himself and as executor of George H. Scripps, answered, asserting the invalidity of the Quadripartite and its abrogation. James E. Scripps and his representatives did the same. Thus we have upon the cross-bill all of the parties to the Quadripartite Agreement lawfully before the court. Edward W. Scripps is the only one who questions the decree, and he is entitled to the consideration of the question.

No affirmative relief is asked by any defendant to the cross-bill, and it is contended that such defendants must be content with a dismissal of the cross-bill. The decree attempted a complete extinguishment of the Sweeney claim in favor of every defendant in the cross-bill. The contention is now made that it is not an adjudication affecting a claim by Edward W. Scripps against the estate of James E. Scripps, and that all questions are open between them. The only answer made to this is that equity, having jurisdiction of the case, may make a decree co-extensive with the necessities of justice, and that it would be overtechnical to say that the dismissal of the cross-bill precluded the idea that the defendants to the cross-bill

had the invalidity of the Quadripartite Agreement passed upon and declared as between them, as they had a clear right to have it passed on under proper pleadings. We are of the opinion that the mere dismissal of the cross-bill was an adjudication of that fact as against Sweeney. Is it binding as between defendants, and, if not, can we make one that will be? We are by no means certain that a mere dismissal of the cross-bill would not render the questions upon which the case turned *res adjudicata* between defendants, but where especially so declared, there can be no doubt of it; the issue being made by the cross-bill and a cross-answer. It would lead to unnecessary litigation if such were not the rule, and no good reason is suggested for a different practice. It is clear that this was contemplated by the decree made, and it will be assumed that the learned circuit judge based it upon the cross-issues, as it could have been upon nothing else. The authorities supporting the practice are numerous.

Counsel for complainant have cited many cases in support of the power of a court of chancery to make decrees between defendants, although the issue be not sharply made between them by the pleading. Daniell states the following rule:

"It is to be recollected that it is a fundamental principle of courts of equity to make as complete a decision upon all the points embraced in a cause as the nature of the case will admit, so as to preclude, not only all further litigation between the same parties, but the possibility of the same parties being at some future period disturbed or harassed by other parties claiming the same matter, as well as of any danger that may exist of injustice being done to other parties who are not before the court in the present proceedings." 2 Daniell on Chancery Pleading & Practice (6th Am. Ed.), p. 990.

An early case was *Chamley* v. *Lord Dunsany*, 2 Sch. & Lef. p. 690, where complaint was made of a decree between codefendants between whom there were no pleadings. Lord Eldon said:

"It is said that a decree is made between defendants, and that such is contrary to the practice of a court of equity because there cannot be a cross-examination between codefendants.  *  *  *  But, my lords, where a case is made out between defendants by evidence arising from pleadings and proofs between plaintiffs and defendants, a court of equity is entitled to make a decree between the defendants. Further, my lords, a court of equity is bound to do so. The defendant chargeable has a right to insist that he shall not be liable to be made a defendant in another suit for the same matter that may be then decided between him and his codefendant. And the codefendant may insist that he shall not be obliged to institute another suit for a matter that may be then adjusted between the defendants, and if a court of equity refused so to decree, it would be good cause of appeal by either defendant."

In *Jones* v. *Grant*, 10 Paige (N. Y.), 348, the chancellor said:

"It is the constant practice of the court to make a decree between codefendants according to the justice and equity of the case, founded upon the pleadings and proofs between the complainant and such defendants."

The rule is recognized in this State. See *Thurston* v. *Prentiss*, 1 Mich. 193. The court said:

"It is no doubt true that a court of equity may make a decree as between codefendants, grounded upon the pleadings and proofs between complainants and defendants. It is the constant practice of courts of equity to do so to prevent multiplicity of suits"—but held that only the defendant could complain of the court not having done so.

In *Hanchett* v. *McQueen*, 32 Mich. 22, the court said:

"It was necessary to determine the rights of the defendants as between themselves, in order that it might be determined to whom conveyances should be made, and on what terms. For this purpose the bill resembles somewhat a bill of interpleader. There was no doubt concerning complainants' rights or duties. The only conflict was among the defendants, and its settlement was essential to the granting of specific performance. It has never been doubted that such rights may be disposed of in one suit, and without cross-bill or other analogous bill."

See, also, *Waldo* v. *Waldo*, 52 Mich. 91 (17 N. W. 709). See, also, *Corcoran* v. *Canal Co.*, 94 U. S. 741, approved in *Louis* v. *Brown Township*, 109 U. S. 162 (3 Sup. Ct. 92); *Tyson* |v. *Tyson*, 37 N. C. 137; *Tavenner* v. *Barrett*, 21 W. Va. 656; *Ingram* v. *Smith*, 1 Head (Tenn.), 411. Many other cases are cited, and the rule contended for by counsel for the estate of James E. Scripps seems the general rule, and we are of the opinion, therefore, that there was no legal impediment to a full adjudication of the differences between Edward W. Scripps and other defendants.

The original bill prays an injunction against Sweeney, but Edward W. Scripps is not a party to that bill. Both complainant and Edward W. Scripps are defendants under the cross-bill, which the latter saw fit to confess. We have seen that the appellee is entitled to a full adjudication against Edward W. Scripps as to rights involved, although there is no pleading between them. As a matter of relief, on a final decree, we see no reason to exclude a perpetual injunction, or any other order essential to complete justice. The power to make a decree between defendants must be accompanied with power to enforce it.

Several other questions are raised and discussed, but it is unnecessary to pass upon them, as the matters already considered fully dispose of the case. As one or more of them would require the laying down of rules that would be far-reaching in their application and consequences, we prefer to leave them open to future consideration.

The decree is affirmed, with costs.

MOORE, MCALVAY, and STONE, JJ., concurred with HOOKER, J. BLAIR, J., concurred in the result.

OSTRANDER, J. I concur in the result, upon the ground that the parties abrogated and avoided the agreement in question.