COMMONWEALTH BONDING & CASUAL-
TY INS. CO. v. BARRINGTON.
(No. 546.)

(Court of Civil Appeals of Texas. Amarillo.
Feb. 7, 1914. On Motion for Rehear-
ing, April 4, 1914.)'

1. EVIDENCE ☞434 — PAROL EVIDENCE —
FRAUDULENT REPRESENTATIONS.

In an action to cancel the note given and
to recover money paid on a stock subscription
contract, which provided that no conditions or
representations not contained therein should be
binding on the defendant company, on the
ground of the fraudulent representations of de-
fendant's agents, their previous oral representa-
tion that the company would loan money to sub-
scribers, inducing the contract, was inadmis-
sible.

[Ed. Note.—For other cases, see Evidence,
Cent. Dig. §§ 2005–2020; Dec. Dig. ☞434.]

2. CORPORATIONS ☞80 — SUBSCRIPTION AND
PAYMENT FOR STOCK—ACTION TO RECOVER—
SUFFICIENCY OF EVIDENCE—FRAUD.

Evidence in a suit to recover the amount
paid and to cancel a note for the balance due
on a stock subscription contract on the ground
of fraudulent representations of defendant's
agents inducing the contract, held insufficient to
sustain the plaintiff's burden of showing such
fraudulent representations.

[Ed. Note.—For other cases, see Corporations,
Cent. Dig. §§ 244, 246–264, 1407, 1407½; Dec.
Dig. ☞80.]

3. CANCELLATION OF INSTRUMENTS ☞4 —
GROUNDS—SUBSCRIPTION CONTRACT.

If the promise of defendant company's
agent to loan plaintiff money was part of the
agreement when plaintiff signed a stock sub-
scription contract not containing such promise
or obligation he should have sought to reform
the contract alleging that it did not speak the
agreement, and cannot maintain suit to cancel
the contract.

[Ed. Note.—For other cases, see Cancellation
of Instruments, Cent. Dig. § 1; Dec. Dig. ☞4.]

4. CORPORATIONS ☞83—SUBSCRIPTION CON-
TRACT—RECOVERY OF PAYMENTS—PECUNIARY
LOSS.

Where plaintiff in a suit to recover the pay-
ment made and to cancel his note for the bal-
ance due on his stock subscription contract,
which were only collateral to the contract in-
debtedness, did not tender or offer to surrender
his stock, he showed no pecuniary loss by any
alleged fraudulent representations of defendant's
agent inducing the subscription contract that
the company would loan him money, and was
not entitled to relief, since the courts do not un-
dertake to deal with the breach of moral obliga-
tions without a showing of pecuniary loss.

[Ed. Note.—For other cases, see Corporations,
Cent. Dig. §§ 328–336; Dec. Dig. ☞83.]

5. FRAUD ☞27 — FRAUDULENT REPRESENTA-
TIONS—ACTION FOR DAMAGES.

Fraudulent promises of defendant com-
pany's agent to plaintiff to obtain stock sub-
scription contract, not contained in the contract,
to the effect that the company would loan plain-
tiff money, gave plaintiff an action for damages.

[Ed. Note.—For other cases, see Fraud, Cent.
Dig. § 8; Dec. Dig. ☞27.]

6. FRAUD ☞12—FRAUDULENT REPRESENTA-
TIONS—PROMISE OF FUTURE PERFORMANCE.

A promise to perform some act in the fu-
ture, although made by one party as a repre-
sentation to induce another to enter into a
contract, will not ordinarily amount to fraud,

though subsequently the promise, without any
excuse therefor, is entirely unperformed.

[Ed. Note.—For other cases, see Fraud, Cent.
Dig. § 14; Dec. Dig. ☞12.]

On Motion for Rehearing.

7. CORPORATIONS ☞80—SUBSCRIPTION CON-
TRACT—ACTION TO CANCEL—WAIVER.

The fact that a corporation, to whose stock
plaintiff had subscribed, paying part of the
amount in cash and the remainder by note, was
not organized as first agreed to among the sub-
scribers, while a matter of which plaintiff could
take advantage before his subscription had been
accepted and acted on by the corporation, would
not, in view of the public interest, permit him
to defeat his subscription obligation, especially
where he had participated to such an extent as
would constitute a waiver of the terms of the
subscription contract.

[Ed. Note.—For other cases, see Corporations,
Cent. Dig. §§ 244, 246–264, 1407, 1407½; Dec.
Dig. ☞80.]

Appeal from Hale County Court; W. B.
Lewis, Judge.

Suit by M. H. Barrington against the Com-
monwealth Bonding & Casualty Insurance
Company. Judgment for plaintiff, and de-
fendant appeals. Reversed and remanded.

Stephens & Miller, of Ft. Worth, and
Cooper, Merrill & Lumpkin, of Houston, for
appellant. Austin C. Hatchell, of Plainview,
for appellee.

HUFF, C. J. The appellee, Barrington,
brought this suit in the county court of Hale
county, against appellant, the Commonwealth
Bonding & Casualty Insurance Company, to
recover the sum of $50 paid, with interest
thereon, and to cancel a note for the sum of
$350, dated December 1, 1910. It is alleged
by the appellee that in August, 1910, and
prior thereto, R. T. Stuart applied to appel-
lee and sought to have him subscribe for
stock in appellant's company and for the
purpose of inducing appellee to purchase said
stock, represented in effect that as soon as
organized the company would begin making
loans to its stockholders; that arrangements
had already been made by appellant where-
by the said company would be in a position
to make a loan to the appellee as soon as
the charter could be secured. Upon the faith
of such representations appellee entered into
a written contract to subscribe for said stock,
and that the representations were false and
fraudulent and made for the purpose of in-
ducing appellee to enter into said contract;
that they were material and relied upon
by the appellee, and he thereby induced to
enter into said contract and to subscribe for
stock in appellant company; that later, on
the 1st day of December, 1910, Ben F. Allen
approached the appellee and made substan-
tially the same representations as did Stuart,
and on that day appellee executed the note
in question, together with the deed of trust,
on certain real estate; that all the repre-
sentations so made were false and fraudulent
and made for the purpose of deceiving the

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

appellee; that in truth and in fact the corporation was not organized under the laws of the state of Texas, and had no authority to make loans and had no arrangements by which money could be secured to loan appellee. It is charged that Stuart and Allen were the agents of the appellant and if they were not their acts and representations were thereafter ratified by appellant. The appellant, by answer, denied the allegations of appellee and denied that Stuart and Allen were its agents or that it ever ratified their acts or representations; that they had no knowledge of any fraudulent representations, etc. The appellee introduced in evidence the following instrument:

Commonwealth Bonding & Accident Insurance Co.

Capital, $10,000.  Surplus, $30,000.

Subscription to Capital Stock.

No. 162. Whereas, Stuart, Harkrider & Co., of Ft. Worth, Texas, are promoting the organization of a casualty, bonding and accident insurance company, to be incorporated in pursuance of the laws of the state of Texas under the name of Commonwealth Bonding & Accident Insurance Company, with an authorized capital stock of $300,000 paid up, and free from organization expenses, all in accordance with a printed prospectus, issued by them and delivered to me: and whereas, by their acceptance of this subscription, said Stuart, Harkrider & Co. agree to endeavor with all reasonable diligence to accomplish on or before December 31, 1910, the organization of said company, with capital stock fully paid as aforesaid, them to defray all expenses of organization and incorporation: Now therefore, I do hereby subscribe for ten one-tenth shares of the par value of $10 each of the capital stock of said Commonwealth Bonding & Accident Insurance Company, and agree with the said company and the said Stuart, Harkrider & Co. to pay therefor the sum of $400, as follows: The sum of $350 I agree to pay in money or securities satisfactory to the Insurance Department with 6 per cent. interest, to said Commonwealth Bonding & Accident Insurance Company, or its trustees (which goes to capital and surplus) at any time after September 1, 1910, immediately upon the receipt of notice from said Stuart, Harkrider & Co. that the capital stock has been subscribed in good faith in amount and at rates netting the company at least $200,000 of capital in the aggregate when paid. The remaining sum of $50 I agree to pay and do pay concurrently with this subscription to said Stuart, Harkrider & Co. in consideration of their agreement heretofore recited and in lieu of any further or other contribution to expenses of organization and incorporating said company. No conditions, representations or agreements other than those printed herein shall be binding on Stuart, Harkrider & Co., or the Commonwealth Bonding and Accident Insurance Company.

Witness my hand this the 9th day of August, 1910.  M. H. Barrington,
[Name of Subscriber.]

On the 1st day of December, 1910, appellee executed his note for the sum of $350, payable to the order of the Commonwealth Bonding & Casualty Insurance Company payable at its office in the city of Ft. Worth, Tex., as set out in its pleadings. The appellee also introduced copy of resolutions of August 27, 1912, which purport to have been passed by a meeting of the executive committee of the Commonwealth Bonding & Casualty Insurance Company, held at Ft. Worth, reciting in effect that there was dissatisfaction among the stockholders of the company who have been disappointed in not being able to get loans which they expected to secure, by reason of the fact that funds have not been available with which to meet the loan requirements of stockholders. In order to obtain the cordial support of the stockholders the committee is convinced that a large number of the stockholders favor a policy which will enable the company to meet the loan requirements of its stockholders, and the charter now meets the legal requirements for a general trust and money loaning business. It was therefore resolved to have its business in different lines in which it had been engaged theretofore underwritten upon the best terms obtainable, in such manner that the company's guaranty funds could be taken down and made available as a loan fund, and thus discontinued the general casualty insurance and surety features theretofore engaged in, and adopting instead trust company features, as authorized by its present charter, which also includes the business of borrowing and loaning money. This resolution was sent by mail to the stockholders and one to the appellee, accompanied by a letter making statement similar to that included in the above resolution. On March 20, 1911, at what is designated a special stockholders' meeting of the Commonwealth Bonding & Casualty Company, held in the Flat Iron Building, in Ft. Worth, Tex., and which appears to have been held under the following call:

"The Commonwealth Bonding & Casualty Insurance Company is now ready to file its charter and enter the field for business and to facilitate the execution of bonds in the transacting of a bonding business, as well as to cover some other features of a general casualty business, it is necessary to have a by-law passed, authorizing the president or active vice president to appoint from time to time, as the business of the company may demand, resident vice president, resident assistant secretaries, an attorney in fact, to represent and to act for and on behalf of the company. For this purpose and for the further purpose of deciding under what state laws this company shall incorporate a meeting of the stockholders is called by the president and executive committee, to be held in the home office of the company in the Flat Iron building, in Ft. Worth, Tex., at 10 o'clock a. m., the 20th day of March, 1911. All the stockholders are requested to be represented either in person or by proxy. Should it not be possible for you to be present, kindly sign one of the two forms of proxies which are inclosed herewith. One authorizes the names selected by the executive committee to act, and the other is in blank and can be filled in as you may select."

At this meeting, it appears that a majority of the stockholders were present or represented by proxies, and by a unanimous vote of the stockholders a by-law was added to the effect that the president or vice president may from time to time appoint a resident vice president, assistant secretary and attorney in fact, to represent and to act on behalf of the company, giving the attorney in fact power to execute bond, recognizance, and

contracts of indemnity, etc. At that meeting they also passed the following resolution:

"That the executive committee of the board of directors of the Commonwealth Bonding & Casualty Insurance Company be and they are hereby authorized and instructed to incorporate said company under the laws of whatsoever state or territory that they may deem best for the interest of the company."

It further appears from the record that on the same day the executive committee reported back that they had decided it to be for the best interest for the stockholders to incorporate under the laws of the territory of Arizona. On March 24, 1911, articles of incorporation were filed with the territorial auditor of Arizona, and in June, 1911, the commissioner of insurance and banking for the state of Texas issued a permit to appellant, authorizing it to do business in the state as a foreign corporation. The testimony of appellee is to the effect that Stuart and Allen made representations as alleged, that he did not secure a loan, and that he made formal applications therefor. There is no evidence showing that he offered to secure such a loan on real estate or otherwise. The evidence further shows that he received notice of the meeting for March 20, 1911, and that he sent his proxy to some man at Canyon City, the name of whom is not disclosed by the record. It is not shown whether his stock was voted at that meeting or not. The testimony is that Ben F. Allen delivered the stock to appellee December 1, 1910, when the note and deed of trust were executed. The certificate of stock is not copied in the record on this appeal. It appears to have been offered in evidence and evidently omitted, and where called for in the statement of facts the contract of subscription is copied in its place. The record does not show whether stock was issued as paid up stock or not. The trial court submitted the case on the issue as to the representations alleged to have been made by Stuart and Allen. The jury found a verdict as prayed for by appellee, and the court rendered judgment canceling the note and in favor of appellee against appellant for the sum of $50, which had been paid to Stuart, Harkrider & Co. at the time of executing the contract of subscription.

This is not a suit to cancel the contract of subscription for stock or the certificate of stock issued, but is simply a suit to cancel the note and recover the money paid.

The appellant assigns as error the action of the trial court in overruling its general exception and in refusing specially requested charge, asking that the trial court instruct a verdict for the appellant.

[1-3] It is urged that the representations made before the contract in question was executed were inadmissible because it varied the terms of the contract. The contract has a clause:

"No conditions, representations or agreements other than those printed herein shall be binding * * * on the Commonwealth Bonding & Accident Insurance Company."

The appellee testified:

"Before I executed the instrument [the subscription contract] Mr. Stuart told me that the purpose of the company was to procure money from the East to loan to its stockholders, and that the company had already made arrangements in the East whereby it would be able to procure money to loan to its stockholders. This was the inducement that caused me to execute the contract. I believed such representations and statements. I would not have executed the contract had not I relied upon the representations and statements made by Stuart at the time and before the execution of the contract. At the time I executed the agreement above described, I paid R. T. Stuart the sum of $50 and later I gave Ben F. Allen my note payable to the company for $350. I subscribed for the shares of stock in the company with the view of getting a loan to get some obligations that I had carried by such company. * * * Allen took the note and deed of trust in December, 1910, or January, 1911, and at the time I told him about the notes that I had on lands owned by me, and he told me, after the company was organized, they would be in a position to take care of such notes for me. At the time he talked with me in December, or January, the company was not then organized, and I understood was to be organized thereafter."

The petition in this case does not seek to reform the contract on the ground of fraud or allege that as drawn it was not the contract agreed upon, but only that it was procured through fraudulent representations which induced appellee to sign it. It is insisted by appellant that appellee should not have been permitted to prove any other agreement or promise than those contained in the contract itself for the reason that the recitals in the contract that there were "no conditions, representations or agreements other than these" contained therein. We were first inclined to believe the proposition presented by appellant to be sound, but under the authority of U. S. Gypsum Co. v. Shields, 106 S. W. 725, and affirmed by the Supreme Court, 101 Tex. 473, 108 S. W. 1165, in which a like provision was contained in an order, in which it was held such provision did not preclude proof of fraudulent representations inducing the contract, and that such proof did not vary the terms of the contract. This case induces us to conclude otherwise. We might note, however, that the grounds set up to avoid the contract in that case were facts outside the contract and did not purport to be part of the promise or agreement, but were only representations that certain contractors would use the material being sold in the construction of government buildings; and it further appears that the cement ordered by the dealer was for the purpose of sale, and in that particular that case is distinguishable from this. The promise by Stuart and Allen that as soon as the company was chartered it would loan money was in effect an agreement. If it should appear that the promise was the consideration for the subscription, upon another trial the case of Moore v. Cross would control. There is no proof that Stuart, Harkrider & Co. had not in fact made arrangements in the East

to procure the money, or that their promise to make the loan was not a bona fide promise at the time it was made. It is possible or probable that the company was itself disappointed in failing to obtain money to loan to stockholders. In this case appellee asked the court to relieve him from the payment of his note, and it therefore rested upon him to show fraud in such representations. This we do not think the evidence produced by him established. If the promise to loan appellee money was part of the agreement at the time the contract was entered into, then we think appellee should have sought to reform the contract according to the agreement, alleging that it did not speak the agreement through fraud or mistake. This is not done, and there is no evidence of deceit used to procure appellee's signature to a contract to which he had not agreed. He admits that he read it over before signing, and he must have known then the agreement to loan him money had been omitted from the writing. The contract signed by him is that there was no other agreement than that contained in the writing. Shall he be permitted to vary the terms or add other terms in the face of the express stipulation that there was no other agreement before or at the time of signing the writing? "Whatever may be said upon the subject prior thereto, it is an elementary principle, that when parties reduce a contract to writing, they are presumed to embody in it the terms and stipulations as finally agreed to, and upon and to which they mutually contract." Wooters v. Railway Co., 54 Tex. 294. The instrument termed "subscription contract" is more properly a proposition on the part of appellee to appellant to take stock in the corporation when formed, and until it was accepted it was subject to withdrawal by him. It would appear that in making such proposition he should have embodied all the terms and conditions upon which he would take stock and pay for the same.

[4] In this case appellee shows no pecuniary loss by representations. He subscribed for the stock, and by his allegations he does not tender or offer to surrender it. He was liable under his proposition to pay for the stock. The note taken and secured was only collateral to the debt already incurred and which was intended evidently to evidence and secure that indebtedness. He has not shown that he has lost anything by the failure of appellant to loan him the money. If the promises of Stuart and Allen under the evidence be considered as representations fraudulently made, they belong to that class of fraud for which there is no redress in courts because there was no pecuniary injury resulting from them. Courts do not undertake to deal with the breach of moral obligations. Moore v. Cross, 87 Tex. 557, 29 S. W. 1051.

[5] If, however, the alleged promises were the consideration and had been inserted in the contract, appellee would be required to resort to his action for damages, if any. Moore v. Cross, supra; Mayer v. Swift, 73 Tex. 367, 11 S. W. 378; Railway v. Titterington, 84 Tex. 218, 19 S. W. 472, 31 Am. St. Rep. 39.

[6] Again, it is said by the courts, "ordinarily a promise to perform some act in the future, although made by one party as a representation to induce the other to enter into the contract, will not amount to fraud in legal acceptation though subsequently the promise is without any excuse entirely broken and unfulfilled. Bigham v. Bigham, 57 Tex. 238; Railway v. Titterington, supra.

On this appeal we have concluded that it is not necessary to discuss the question of the agency of Allen and Stuart or the effect in accepting by appellant the contract obtained by them from appellee. There is a suggestion by the pleadings and by appellee on appeal that the contract made by the appellee, by which he subscribed for stock in a corporation to be formed under the laws of Texas and that appellant corporation was created under the laws of Arizona. This issue does not appear to have been urged in the court below, and is not sufficiently developed in this record to enable us to express an opinion. There is a suggestion that the note is void as being in violation of article 12, § 6, of the Constitution. Without discussing this question further than to say from this record we are unable to say that the note appears to have been given in payment of stock issued to appellee by appellant. These matters we think if they are issues should be fully developed. It should be noted that appellee, by his pleading, does not seek to cancel his subscription contract, but only the note given, doubtless to evidence and to secure the payment of his subscription. We do not think under the issues presented by the trial court the evidence sufficient to support the verdict and judgment.

The case should be, and is, reversed and remanded.

### On Motion for Rehearing.

The appellee contends in this case there is no evidence justifying us in finding that appellee made no application to borrow money from appellant corporation. True he testifies he made a formal application to borrow from Ben F. Allen when Allen took his note. At that time the corporation was not in existence. Its charter had not even been applied for, and his own evidence shows he made no application for a loan after it was incorporated and when it could act as a corporation. The certificate of stock which appellant claims to have tendered was issued long before there was any company in existence, and until it was in ex-

istence we do not see how appellant could have issued to him stock therein.

[7] The fact that the corporation was not organized as first agreed to among the subscribers, was a matter of which appellee could take advantage before his subscription was accepted and acted on by the corporation, but we think on the ground of public interest, he will not now be permitted to defeat his obligation as a subscriber. Especially is this true if he has so participated and to such an extent as will constitute a waiver of the terms of the subscription contract. He may or he may not be estopped, according as the facts shall develop; but he and his associates, on the face of the record, have induced the state by their subscriptions, represented as bona fide, to grant to the corporation existence and certain franchises, and for aught that appears from this record, may have induced third parties to deal with the corporation as such, or to lend it money and take its obligation upon the faith of the subscription by its stockholders. It would manifestly be unjust to permit stockholders to recover the money paid and to defeat their subscription, when, by their acts, they have brought into existence the corporation, not only to third parties, but also to their associate subscribers. Cook on Corporations, §§ 88, 183 to 186.

Appellee testifies the promoters promised that the corporation, when organized, would lend him money if he subscribed for stock. If the stockholders do not pay their subscriptions, where did appellee expect it to get the money? It certainly would not fall like manna from heaven. The note and the deed of trust may be merely to secure appellee's subscription and not a payment for stock. We declined to discuss this question in the original opinion because not fully developed in the trial court.

We see no reason for changing our views in this case as heretofore expressed, and the motion will be overruled.