E. W. JUDKINS *vs.* R. M. CHASE.

E. W. JUDKINS *vs.* H. F. JONES.

E. W. JUDKINS *vs.* H. L. ABBOTT.

Piscataquis.   Opinion April 4, 1922.

*In an action on a note if the plaintiff "is not a bona fide holder for value" all defenses may be raised that could be made as between the original parties.   Total failure of consideration may be shown under the general issue, but partial failure must be specially pleaded.   Fraud is never presumed, but must be clearly proved, and whether it exists or not is an issue of fact, and vitiates a contract whatever its language, and no contractual limitation of remedy can oust the courts of jurisdiction.   The issue of fraud should be submitted to the jury unless it is proved so clear and manifest as to justify the court in deciding that it is established as a matter of law.*

An allegation of fraud presents an issue of fact to be submitted to a jury unless fraud is so clearly proved that honest and fair-minded men can only reach one conclusion, so manifest that a jury verdict negativing fraud would be set aside.

Total failure of consideration need not be specially pleaded.   It traverses an essential allegation in the declaration.   But partial failure depends upon a different principle.   It is allowed to avoid circuity of action.   It must be specially pleaded.   Therefore, warranty as a defense requires a special plea.

On exceptions and motion for new trial by plaintiff.   These are actions of assumpsit founded upon joint and several notes signed by defendants and five others, on which defendants were sued severally by the endorsee, the notes being for $900 each, dated August

7, 1918, one payable in one year and the other in two years, each bearing an indorsement of $200. The notes were given in payment of the purchase price of a Percheron Norman stallion bought of one R. I. James, the payee of the notes, who endorsed the notes before maturity to the plaintiff. The defendant pleaded the general issue, and for a brief statement of special matter of defense alleged; that the consideration for the notes had wholly failed, and that the plaintiff was chargeable with notice of such failure of consideration and was not a bona fide holder for value without notice; that there was fraud and misrepresentation in the procurement of the notes, of which the plaintiff had knowledge which avoided them. At the conclusion of the evidence the presiding Justice submitted to the jury two interrogatories, and upon receiving the answers thereto, directed a general verdict for the defendant, and plaintiff excepted, and also filed a general motion for a new trial. Motion sustained. New trial granted.

The case is fully stated in the opinion.

*C. W. & H. M. Hayes* for plaintiff.

*Harry Manser* for defendants.

SITTING: SPEAR, HANSON, PHILBROOK, DUNN, MORRILL, WILSON, DEASY, JJ.

MORRILL, WILSON, JJ., concur in result.

DEASY, J. Eight men associated under the name "Percheron Breeders Society of Maine" bought a stallion of one R. I. James making payment by two joint and several promissory notes for nine hundred dollars each signed by all the purchasers. The payee indorsed and transferred the notes before maturity to E. W. Judkins the plaintiff. The three suits now under consideration are brought on these notes, against three of the makers.

The plea in each case is the general issue with a brief statement that the plaintiff "is not a bona fide holder for value" and also setting up total failure of consideration and fraud.

The jury by special verdict found that the plaintiff was not a bona fide holder for value. This finding was abundantly justified. The suits, therefore, are open to all defenses that could be made as between the original parties.

Besides the special interrogatory above referred to, the jury were required to answer this question—"What was the difference if any between the market value of the stallion at the time of the sale and his market value if he had been in the condition guaranteed by Mr. James?" To this question the jury answered "Fifteen hundred dollars."

No other issue was submitted to the jury.

Upon receiving the answers to the two special interrogatories (it appearing that $400 had previously been endorsed on the notes) the presiding Justice directed a general verdict for the defendant. The plaintiff excepted. He also filed a motion for a new trial.

The directed verdict cannot be sustained on the ground of total failure of consideration. The defendants received title to and possession of a stallion. Their own testimony shows that the animal had a value of two hundred dollars. This was an inadequate consideration. But inadequacy is not failure of consideration. *Furber* v. *Fogler*, 97 Maine, 588.

The defenses of total failure and partial failure of consideration depend upon different principles.

The defendant who pleads total failure denies the consideration. His defense traverses an essential allegation in the declaration. It may, therefore, be shown under the general issue. *McCormick* v. *Sawyer*, 108 Maine, 407. But the defense of partial failure admits the contract. Its purpose is the avoidance of circuity of action. Its effect is the reduction of damages. *Hathorn* v. *Wheelwright*, 99 Maine, 354. Breach of warranty creates such partial failure. It, however, must be specially pleaded. This is true at common law. *McCormick* v. *Sawyer*, 108 Maine, 408. It is equally true under the Negotiable Instruments Act. *Indiana Flooring Co.* v. *Rudnisk*, 236 Mass., 92.

In these cases the defendants pleaded fraud, but we do not understand that a warranty is claimed. At all events it is not pleaded.

If the general verdict for the defendant was properly directed and rendered it was because of fraud. But whether fraud exists or not is an issue of fact. Fraud is never presumed. It must be clearly proved. *Grant* v. *Ward*, 64 Maine, 240; *Frost* v. *Walls*, 93 Maine, 412.

True, if fraud is so clearly proved that honest and fair-minded men could not reach a different conclusion; so manifest that a jury

ver dict negativing it would be set aside, then in such case it would be proper for and would be the duty of the court to direct a verdict. *Johnson* v. *Railroad Co.*, 111 Maine, 265.   *Lindsey* v. *Spear*, 112 Maine, 233.

In the last analysis, therefore, the decision of these cases depends upon the answer to the question as to whether verdicts for the plaintiff would be set aside as manifestly erroneous.

Upon delivery of the stallion a written contract was signed and delivered by the parties.   It granted to the Percheron Breeders Society of Maine "the following described stallion to wit:   Charles pure bred stallion No. 117812 color black steel gray."   The conditions of the contract are thus fairly summarized in the defendants' brief.

"It acknowledged receipt by the vendor of the sum of $1800. It provided that if the stallion in good health and with proper usage did not get with foal 50 per cent of mares regularly tried and bred to him between the first day of May and the first day of July, 191  , then upon return of the stallion during the first week in April next following, sound and in good health and condition, to the vendor at Foxcroft, Maine, then the stallion would be exchanged for one of equal quality as the stallion sold.   The purchasers by the contract, as a condition precedent to the right of return were required to keep a tally sheet of the same form as that attached and send same to vendor at Foxcroft by registered mail not later than July 15, A. D. 191  ."

The contract was signed by R. I. James.   Incorporated as a part of it was an agreement signed by all the purchasers reading thus:

"This foregoing Bill of Sale contains all the representations and all the terms of agreement of the purchase of the above named stallion.   We hereby acknowledge having purchased the said stallion on the representation and on the terms herein set forth, and no other."

The evidence shows that the stallion sold, served, after such sale, fourteen mares, and that none of them were gotten with foal except one whose foal was born dead.   The evidence also tends to prove that the stallion was worth about $200.

No misrepresentation of any specific fact is shown.   The contract describes the stallion as pure bred.   This is not disputed.

If there is a representation that the stallion would get with foal fifty per cent. of mares served, this is a promise to be performed in the future, which promise cannot be made the basis of an action for or claim of fraudulent misrepresentation. *Carter* v. *Orne*, 112 Maine, 367; *Lembeck* v. *Gerken*, 86 N. J. L. 111 90 At. 698; *Dawe* v. *Morris*, 149 Mass., 188; *Pile* v. *Bright*, 156 Mo. Ap., 301; 137 S. W., 1017; *Commonwealth Co.* v. *Barrington*, (Tex.), 180 S. W., 936.

The written contract ingeniously avoids specific representations. No oral representations are proved. Yet the whole transaction is questionable. Its very adroitness arouses suspicion. It subjects the purchasers to burdensome conditions. While literal construction was perhaps not contemplated such construction would limit the buyers' remedy to an exchange of a practically worthless stallion for another equally worthless. Fraud vitiates a contract whatever its language. If fraud is clearly proved no contractual limitation of remedy can oust the courts of jurisdiction.

Assuming that there is sufficient evidence of fraud to support a jury verdict for the defendant, is fraud so clear and manifest as to justify taking the case from the jury and deciding as a matter of law that fraud is established? If a jury seeing and hearing the parties should believe and determine that the contract was entered into in good faith by all parties, would such verdict necessarily be set aside? Is the written contract necessarily fraudulent in the absence of any testimony of fraudulent knowledge or intent except as found within it?

These questions we have to answer in the negative. Whether or not the transaction was fraudulent should be determined by a jury.

*Motion sustained.*
*New trial granted.*


Dissenting note, SPEAR, J.

Concurring, HANSON, J.

I concede that the report in this case presents a very close question, and I publish my note not so much as a dissent, as to furnish an analysis of the contract for the information of the public of the kind and nature of the schemes resorted to for the purpose of deceiving and defrauding the people.

In this case the stallion was bought for breeding purposes. The terms of the contract imply what the vendor well knew that he might fail in this regard. The vendees also knew it, and, as ordinary prudent men, would never have paid the large sum they did, without what they consider a guarantee, that in some way, they would receive full consideration for the money paid. The contract accordingly was a trick in phraseology devised and employed for the purpose of obtaining their money for a breeding stallion, and to avoid in the end responsibility for not furnishing one. The legal effect of the contract was to avoid the form of a direct guarantee, and at the same time allay suspicion of this real purpose, by the use of studied phraseology to hide the deceit and, to accomplish this, it provides, upon certain conditions, for the return and substitution of another of equal value.

In the end the contract in its entirety was a manifest scheme for the purpose of getting money without adequate consideration, and to avoid responsibility for the method of obtaining it. The contract itself, as evidenced by the internal evidence of its terms, was based upon a fraudulent purpose and should not receive the sanction of judicial approval.

Fraud vitiates every contract written or parol, *Manufacturing Company* v. *Brown*, 113 Maine, 53 states the rule thus:

"We do not overlook the fact that the defendant signed a written contract and, by the ordinary rules of law, is presumed to know its contents, whether read or not. But if shown that the contract, itself, was procured by fraud, the general rule does not apply. If it did, no written instrument could be avoided. But it is universally held that the most sacred instrument may be avoided for fraud. Accordingly, the question to determine, is not whether the contract was signed and entitled to the ordinary force of such an instrument, but whether it is entitled to any force as the contract of the defendant. 'Fraud has been defined to be any cunning, deception or artifice used to circumvent, cheat or deceive another'."

It will undoubtedly be conceded that a contract, honest and above board, if clearly expressed means just what it says, and needs not to be strengthened by a series of caveats. More than one half of the composition of the present contract is taken up with such warnings. So emphatic, extensive and varied are the expression as to how the vendees were required to interpret and understands

this contract that we quote them in full. After stating that if the first stallion fails they will furnish "another of equal quality," the contract proceeds to say:

(1) "And it is expressly understood between the parties hereto that the vendors shall not be responsible or accountable to said purchaser in any other way for the stallion hereby sold, failing to get the mares bred to him with foal.

(2) "It is further expressly understood and agreed that the said purchaser upon entering into this contract does not rely upon any representation made by the vendors, their agent or agents, or employees, or any or either of them, not expressed in this instrument.

(3) "That said vendors shall not in any way be liable for any claim, or demand that may hereby be made by any reason of any representation or agreement heretofore made by themselves, their agents or employees, or any or either of them, in making of the sale of the stallion hereby sold, except for such as are contained in this instrument.

(4) "No agent or employee of the vendors have any authority to make any changes or alterations in this contract.

(5) "It is expressly understood and agreed that time of performance of each act to be done as provided in this instrument shall be considered as the essence of this contract." The contract is then signed and sealed by the vendor, R. I. James. Not satisfied by the foregoing five it then adds the sixth caveat after the contract is executed so as to be sure to have all avenues of escape cover the entire contract.

(6) "This foregoing bill of sale contains all the representations and all the terms of agreement of the purchase of the above named stallion. We hereby acknowledge having purchased the said stallion on the representation and on the terms herein set forth, and no other."

This is signed by the eight purchasers.

The sole purpose and import of these six additions to the contract were to obtain an agreement from the vendees that they would consent to be bound by the terms of the contract, just as it read, even though it was conceived in fraud and obtained by deceit. The first caveat expressly states that the vendor shall be responsible upon failure of the stallion only by furnishing another of equal

quality. And that is the only obligation he assumed as will appear later. It is unnecessary to analyze these six provisions as they speak for themselves, and clearly demonstrate the purpose for which they were put into the contract, and are internal evidence that the vendors anticipated that the contract might be attacked for fraud, and endeavored by these provisions to bind the vendees against such an attack. But such attempt cannot succeed. *Manufacturing Company* v. *Brown,* 113 Maine, 51.

The fraudulent import of the contract is further proved by the conduct of the vendor. He endorsed and transferred the note before maturity. This was an act subsequent to the execution of the contract and was accordingly admissible to show the purpose of the endorsement and delivery. But the transfer was not made in good faith and so found by the jury. It was undoubtedly to forestall a defense, upon the ground that the note was in the hands of an innocent holder. This established fact has a bearing upon the intent and purpose of the contract as understood by the vendor, and may be considered as some evidence in giving an interpretation to that instrument.

Another fact is that the stallion was sold for eighteen hundred dollars ($1,800) and the jury found him to be worth fifteen hundred dollars ($1,500) less, or only of the value of three hundred dollars ($300) when sold. But it may be said that the diminished value was due to the failure of the stallion to get foals. True, but this deficiency was contemplated in the contract. And the contract undertakes to provide against this deficiency by artifice and design; going just far enough to mislead and deceive the vendees, but not far enough to give any form of legal redress. The contract, so contrived and expressed as to put ordinary careful and prudent men off their guard in such a manner as to induce them to pay eighteen hundred dollars ($1,800) for a three hundred dollar ($300) horse, furnishes some evidence of fraud in the disparity between the price paid and the value received.

But that alone is not sufficient to give them redress. But it is evidence bearing upon the fraudulent design of the contract. It is often held in equity that great deficiency in consideration is ground for relief. We have alluded to the internal evidence of fraud and the external evidence of fraud and now we come to the fraud itself, although cunningly concealed.

The fraudulent intent of the contract in question is found in what appears to be an agreement to make good the contingent deficiency of the stallion, which, of course, would make good the consideration, when as a matter of law no such agreement is to be found, and this is where the fraudulent purpose appears. An analysis of this part of the contract will show it to be a studied and cunning device calculated to deceive. It does not guarantee that the stallion will get with foal fifty per cent. of the mares served, for that clause in the end might mean something; but that if he does not get fifty per cent. they may return him and exchange him for another of "equal quality as the stallion sold."

And that is all the provision there is in this contract by which the vendees were to be protected against the loss of fifteen hundred dollars ($1,500). If the language of the contract had been clear they could find no fault, but redress was undoubtedly what the phraseology intended to carry to their minds, and deceitfully did so.

At this juncture what are the relative rights of the parties under this phase of the contract? If the second stallion proved like the first, then one of two constructions must appear, to give the vendees any redress.

(1) A guarantee that the second stallion should get fifty per cent. or over of foals.

(2) That the first one proved worthless; that the second one proved worthless; hence was of equal quality. There is no claim of a guarantee. The meaning then is, if the second stallion proved to be worthless, that was the end of any contractual obligation on the part of the vendor, and that the vendees have no further redress although lead to believe they were protected. The anticipated effect of that contract resulted not in theory but in the actual fact that the vendees kept one worthless stallion a year, exchanged him for another equally worthless, and have paid the vendor eighteen hundred dollars ($1,800) besides the keeping, and there the contract ends.

That is just what caveat Number One provides, as a reference to it will prove, namely that "the vendors shall not be responsible in any other way" except by return and exchange of a stallion of "equal quality." In the last analysis no other construction can be placed upon the ingenious phraseology employed to give expression to this contract. If there is, we are unable to discover it.

In my opinion the contract in question was a cunningly devised scheme calculated to deceive would-be purchasers of high-bred stallions for breeding purposes, by leading them to believe that in the end, at least, they would receive a stallion of the quality desired, when as a matter of law if the second stallion proved worthless he would technically be within the language of the contract, and there is no further provision.

In other words, the final construction of this contract is expressed by the syllogism; the first stallion proved worthless; the second stallion proved worthless; hence the second one was of "equal quality" with the first one.

A contract that results in such legal conclusions is unconscionable, unfair, deceitful, and should not receive the sanction of the court. I am persuaded that the ruling of the Chief Justice was right and that the exceptions should be overruled.