COMMONWEALTH BONDING & CASUALTY INS. CO. v. HOLLIFIELD. (No. 904.)*

(Court of Civil Appeals of Texas. Amarillo. Jan. 19, 1916. Rehearing Denied March 15, 1916.)

CORPORATIONS ⚎99(1)—CORPORATE STOCK—PURCHASE PRICE.

Where plaintiff entered into an agreement to buy the stock of a corporation to be organized with a capital and surplus, and to pay the purchase price in money or in satisfactory securities, and plaintiff gave notes for the purchase money, which notes were renewed and the amounts varied, *held* that, the stock issued for the notes being void because being issued in violation of Const. art. 12, § 6, prohibiting the issuance of corporate stock for notes, the notes should be canceled.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 444; Dec. Dig. ⚎99(1).]

Huff, C. J., dissenting.

Appeal from District Court, Hall County; J. A. Nabers, Judge.

Action by I. P. Hollifield against the Commonwealth Bonding & Casualty Insurance Company. From a judgment for plaintiff, defendant appeals. Affirmed.

Speer & Brown, of Ft. Worth, and Presler, Thorne & Hamilton, of Memphis, for appellant. Moss & Leak, of Memphis, for appellee.

HALL, J. This was an action by appellee, Hollifield, against the appellant company, to recover certain money paid and to cancel three promissory notes in the sum of $562.50 each, executed by Hollifield, in favor of the defendant company. Appellee also prayed for the cancellation of a certain deed of trust, given by him to secure the notes. He alleges that the payment of the money and the execution of the notes were induced by fraudulent representations, and that the only consideration moving to him therefor was the issuance of a certain stock certificate, in violation of article 12, § 6, of the Constitution of the state. Briefly stated, this is the history of the transaction: September 29, 1910, appellee executed a subscription contract, which is as follows:

"Commonwealth Bonding & Accident Insurance Company.
"Capital $10.00     Surplus $30.00.
"Subscription to Capital Stock.
"No. 983.

"Whereas, Stuart, Harkrider & Co. of Fort Worth, Texas, are promoting the organization of a casualty, bonding and accident insurance company, to be incorporated in pursuance of the laws of the state of Texas, under the name of Commonwealth Bonding & Accident Insurance Company, with an authorized capital stock of three hundred thousand dollars, and a paid up capital of at least two hundred thousand dollars, paid up and free from organization expenses, all in accordance with a printed prospectus issued by them and delivered to me.

"And, whereas, by their acceptance of this subscription said Stuart, Harkrider & Co. agree to endeavor with all reasonable diligence to accomplish on or before December 31, 1910, the organization of said corporation with capital stock fully paid as aforesaid, they to defray all expenses of organization and incorporation.

"Now, therefore, I do hereby subscribe for 62½ one-tenth shares of the par value of ten dollars each, of the capital stock of said Commonwealth Bonding & Accident Insurance Company, and agree with said company and with the said Stuart, Harkrider & Co. to pay therefor the sum of $2,500.00 as follows: The sum of $2,187.50 I agree to pay in money or securities satisfactory to the Insurance Department, with six per cent. interest, to said Commonwealth Bonding & Accident Insurance Company, or its trustees (which goes to capital stock and surplus), at any time after September 1, 1910, immediately upon receipt of notice from said Stuart, Harkrider & Co., that its capital stock has been subscribed in good faith in amounts and at rates netting the company at least two hundred thousand dollars of capital in the aggregate when paid. The remaining sum of $312.50 I agree to pay, and do pay concurrently with this subscription, to the said Stuart, Harkrider & Co., in consideration of their agreement hereinbefore recited, and in lieu of any further or other contribution to expenses of organization and incorporating said company.

"No conditions, representations or agreements other than those printed herein shall be binding on Stuart, Harkrider & Co., or the Commonwealth Bonding & Accident Insurance Company.

"Witness my hand, this the 29th day of September, 1910.
"I. P. Hollifield (name of subscriber)
"Memphis, Texas (Post office address)
"Merchant and Ranchman (Occupation)."
"Witness: R. E. Bristol."

This subscription contract was at once delivered to Stuart, Harkrider & Co., a partnership, which was afterwards incorporated and known as the Organization Company. Thereafter, on December 1, 1910, upon the promise that stock would be issued to him as soon as the defendant company was organized, appellee executed and delivered to the Organization Company four notes, payable to said company, and also a deed of trust conveying certain lands as security for said notes. The first of these notes was in the sum of $687.50; the other three were in the sum of $500 each. Prior to December 1, 1912, the first note was paid by appellee, and on that date he renewed the remaining three notes, including some unpaid interest which had accrued thereon in the face of the renewals. The new notes aggregated $562.50 each. On the same day he executed a second deed of trust to secure the payment of the renewal notes. Twenty days thereafter the deed of trust securing the original notes was released by appellant.

Appellee alleged that it was fraudulently represented to him by the promoters, as an inducement to secure his subscription to the stock, that appellant company, when organized, would lend him money; that the representations were relied on, were untrue, etc. Among other things, appellant company alleged that it was incorporated under the laws of Arizona, where there was neither statute, constitutional provision, nor rule of law prohibiting the execution and delivery of notes in payment for certificates of stock; that in such case the laws of Texas, forbidding the payment for stock with negotiable notes, is in violation of the Constitution of the United States.

The case was tried before the court without a jury and resulted in a judgment in favor of plaintiff, canceling the three notes and deed of trust, but denying plaintiff a judgment for the money already paid. In the findings of fact and conclusions of law, the trial judge states that the defendant corporation was chartered under the laws of Arizona in March, 1911, and was granted a permit to do business in Texas, in June of the same year; that upon solicitation of R. T. Stuart, and because of promises made by him that the company, when organized, would lend plaintiff money, plaintiff subscribed for 62½ shares of its capital stock; that Stuart and one Harkrider composed a partnership known as the Organization Company, which promoted the defendant company; that, in accordance with the subscription contract, the Organization Company took plaintiff's notes for $2,187.50, in payment for the 62½

shares of stock to be issued by the defendant company; that after the defendant company had obtained a permit to do business in Texas, and plaintiff had paid $687.50 on his subscription, the promoting company released the deed of trust and the defendant company took from plaintiff three notes for $562.50 each, the renewals of which are sought to be canceled, together with the deed of trust securing the same; and that said notes were taken in payment of the stock which was then issued to plaintiff at Ft. Worth, Texas. The court concludes that no fraud was shown in the case; that the certificate of stock under the Constitution, as well as article 1146 of the Revised Statutes, was absolutely void and constituted no consideration for the notes and deed of trust; that plaintiff was not in pari delicto, but was not entitled to recover of the appellant company the money paid. Appellee filed no cross-assignments.

By the first assignment of error, this proposition is urged: After said defendant company had been organized and chartered and had its permit to do business in Texas, and plaintiff had paid $687.50 of its said subscription, said promoting company released the deed of trust securing said subscription, and the defendant company took from plaintiff the three $562.50 notes, which, and the renewals of which, so sought to be canceled and the deed of trust herein sought to be canceled, in payment of the stock which they then issued to plaintiff; that is, the 62½ one-tenth shares of stock in controversy.

The first assignment is that the court's conclusions of fact are not supported by the evidence. We think, when appellee executed the notes and the deed of trust securing them, the subscription contract as an obligation became functus officio as to him; he had, by complying with its terms, merged the obligation evidenced by it and resting upon him, in the notes themselves. His indebtedness, evidenced by the subscription contract, was satisfied and thereafter was evidenced by the notes which he had executed. The contract bound the promoters to organize a company with reasonable diligence, having its capital stock fully paid up and free of organization expenses. It bound appellee to pay in cash $312.50 to the promoters as compensation for their services. This has been done. It further bound him to pay to the company the balance of the $2,500 subscribed, viz., $2,187.50 "in money or securities satisfactory to the Insurance Department, with 6 per cent. interest, at any time after September 1, 1910, immediately upon receipt of notice from Stuart, Harkrider & Co.; that its capital stock had been subscribed in good faith in amounts and at rates netting the company at least $200,000." The parenthetical clause provides that this amount shall go to capital stock and surplus. It must be borne in mind, in the construction of this contract; that appellant is a corporation, organized for bonding and casualty insurance purposes. This court said, in General Bonding & Casualty Insurance Co. v. Mosely, 174 S. W. 1034, quoting from Words & Phrases:

" 'Capital stock' has been defined as follows: When applied to the amount subscribed towards the stock of a corporation, 'capital stock of a corporation, in its primary sense, means the fund, property, or other means contributed or agreed to be contributed by the share owners as the financial basis of the corporation's business, either directly through stock subscriptions or indirectly through the declaration of stock dividends. The term signifies those resources the dedication of which to the uses of the corporation is made the foundation for the issuance of certificates of capital stock, and which, as the result of the dedication, becomes irrevocably devoted to the satisfaction of all obligations of the corporation. * * *' 'Capital stock of a corporation consists of the property and money subscribed and paid in for the purpose of carrying on its business. * * *' 'The term "capital stock" has a * * * definite meaning, and designates the amount of capital contributed by the stockholders for the use of the company. * * *' "

The par value of each one-tenth share of stock is stated in the subscription contract to be $10. "Par value," as there used, means simply the face value of the stock. 6 Words and Phrases, 5136; 3 Words and Phrases (2d Series) 866. The amount due, according to the recital of the contract, for the 62½ one-tenth shares, at $10 each, is $625, or one-fourth of the entire amount subscribed; yet no separate obligation was made as was done in providing for organization expenses for the price of the stock at the stated sum per share. After the payment of the $312.50, as organization expenses, a note was executed for $687.50, and the remaining amount of the total subscription, viz., $1,500, was divided into three separate notes. After the payment of the first note, the shares of stock were issued. These facts show a practical construction of the contract, which to our minds is inconsistent with the idea that the price to be paid for the stock, and the sum to be paid in as surplus, were independent and distinct obligations. The subscription contract bound appellee to execute his obligations in the sum of $2,187.50, evidencing an agreement to pay for the stock in installments.

It has been frequently held that a subscription contract binding the subscriber to pay for his stock in installments is not inhibited by article 12, § 6, of the Constitution; but it has also been uniformly held that, when the stock is issued before the installments are fully paid, the transaction is void. When the subscription contract was drawn it is apparent that this article of the Constitution, and the decisions which have construed it, were not in the mind of the party who wrote it. We further said, in General Bonding & Casualty Ins. Co. v. Mosely, supra:

"But the plaintiff in error company is engaged in a business requiring ready cash to meet demands arising at unexpected times in uncertain amounts. An insurance company, in the very nature of things, should have on hand, ei-

ther in cash or in available securities, sufficient funds with which to meet extraordinary emergencies. This it could not do, at least for a time, if the subscribers paid for stock with labor or with property other than cash or securities easily convertible into cash."

That provision in the contract with reference to the approval by the Insurance Department shows that it was drawn under the act of 1909, specially relating to insurance companies. We have given our views with reference to this law and its application in the Mosely Case, and they will not be repeated here. Suppose, in the instant case, appellee had agreed to pay only $1 each for his shares of stock, and the balance of the $2,187.50 should have been represented by his promissory notes, and this course had been pursued with reference to all other subscribers: The result would have been the organization of a $300,000 bonding and insurance company, with less than 1/40 of that amount in its treasury to secure policy holders and creditors. Under the construction contended for by appellant, the entire subscription contract would be void. However, if we construe it to mean that the whole amount subscribed, less organization expenses, rather than $625 constitutes the consideration for the stock, the contract would be valid and enforceable. The vice in the transaction rests in the fact that the stock was issued and delivered to appellee, thus enabling him to enjoy all the privileges of a bona fide stockholder without having "fully paid up" the amount of his subscription. As has been frequently decided, both the stock and the notes were absolutely void. Irrigation Co. v. Deutschmann, 102 Tex. 201, 105 S. W. 486, 114 S. W. 1174; McCarthy v. Loan Co., 142 S. W. 96; Sturdevant v. Falvey, 176 S. W. 908; Bonding & Casualty Ins. Co. v. Mosely, supra.

Under the third assignment, it is insisted that because the appellant company was organized under the laws of Arizona, and the evidence shows that there is neither constitutional provision nor statute of Arizona prohibiting the payment of shares of stock with a promissory note, the transaction in question is valid. Article 1146 of the Revised Statutes 1911 provides that no foreign corporation, domestic or foreign, doing business in this state, shall issue any stock whatever except for money paid, etc. The record shows that the home office of appellant company was at Ft. Worth; that the subscription contract was executed in Texas; and that the notes, together with the deed of trust, were executed and renewed in this state. The contract itself provides that the company "is to be incorporated in pursuance of the laws of the state of Texas." Under the provisions of the above statute, these facts render the transaction subject to the laws of Texas. State Bank v. Falvey, 175 S. W. 833; Sturdevant v. Falvey, supra; Fowler v. Bell, 90 Tex. 150, 37 S. W. 1058, 39 L. R. A. 254,

59 Am. St. Rep. 788; Loan Ass'n v. Griffin, 90 Tex. 487, 39 S. W. 656.

What has been said disposes of the fourth assignment.

The fifth assignment insists that the court erred in holding that the notes were without consideration because the evidence shows that, relying upon plaintiff's subscription contract and his promise to pay for his stock, defendant and the public generally dealt with plaintiff as a stockholder, and that the defendant company has incurred liabilities and created obligations on the strength of plaintiff's subscription; and further, by reason of the fact that plaintiff had participated by proxy in the management and conduct of the affairs of the company, he was estopped to assert the invalidity of the transaction. This is not a suit by a creditor of the corporation, seeking to hold appellee upon his subscription, and it is not necessary to consider that question.

The stock being declared invalid by the constitutional and statutory provisions, appellee is not estopped by participation as a stockholder in the meetings of the company from asserting the invalidity of the notes.

We think the record warranted the court in finding, in accordance with the testimony of appellee, that the whole amount of his subscription, as evidenced by his original notes, was the consideration for the stock issued to him; and the judgment is therefore affirmed.

HENDRICKS, J. (concurring). I agree with Justice HALL in affirming this case, and relative thereto make the following observations:

I think the obligatory features of the contract of subscription as to the methods of payment for the stock, for which Hollifield subscribed, are unambiguous.

That portion of the contract is as follows: "Now, therefore, I do hereby subscribe for 62½ one-tenth shares of the par value of $10.-00 each, of the capital stock of said Commonwealth Bonding & Accident Insurance Company, and agree with said company to pay therefor the sum of $2,500.00, as follows: The sum of $2,187.50 I agree to pay in money, or securities satisfactory to the Insurance Department, with six per cent. interest, to said Commonwealth Bonding & Accident Insurance Company, or its trustees (which goes to capital stock and surplus). * * *"

As I read it, the obligation on its face is to pay the sum of $2,500 for the stock, either in money or securities satisfactory to the Insurance Department.

According to my view, the question is: Is the liability on the subscription contract actually extinguished by the giving of securities, as shown by the acts of the parties in this record, as intended by their acts; and whether such securities are a payment for the stock as evidenced by their acts, as an alternative substitute for the actual cash? When the contract reads he may either pay in cash or approved securities, the alterna-

tive nature of the payment, that is, cash or securities, adds force to the meaning that they really intended under appropriate conditions that the securities should be considered in lieu of the cash. If such a condition is sufficiently shown in this record—declaring the intention of the parties with reference to the alternative provision as controlling the method of payment—I am unable to say that the subscription contract continues to be one payable in installments, and that said securities, if shown in this record to be regarded as payment by the parties, would continue to be substituted obligations as merely continued installments of the subscription contract, instead of obligations in payment of the stock.

The question is not wholly one of renewals being a perpetuation of the same debt, but there is also involved the question, which of the alternative provisions of this contract is acted upon, as shown by the acts of the parties?

" * * * When the promoters of a corporation have made a contract in its behalf, to be performed after it is organized, it may be deemed a continuing offer on the part of the other party to the agreement, * * * and may be accepted and adopted by the corporation after such organization. * * *" Railway Co. v. Granger, 86 Tex. 355, 24 S. W. 795, 40 Am. St. Rep. 837.

Hence, when the corporation, Commonwealth Bonding & Casualty Insurance Company, came into existence, by virtue of the issuance of its charter, and said contract was in its possession and presumptively adopted by the company, it was adopted as a whole.

The contract was executed by Hollifield the 29th day of September, 1910. About that time, according to the testimony of Mills, who was the secretary of this defendant company, an organization meeting was held, and some of the officers of said proposed corporation elected.

Subsequent to the date of the contract, December 1, 1910, this defendant executed the first series of notes, with an accompanying deed of trust on 1,400 acres of land, to secure said paper. Evidently the above contract, with the paper, was in the hands of the officers of the proposed corporation prior to the date of its charter in March, 1911, for on February 6, 1911, Mills, who had been elected secretary of the contemplated corporation, wrote Hollifield that they had been advised that the State Commissioner of Insurance required a statement from two disinterested parties, placing an estimate of value on the property used in securing the balance due for Hollifield's stock subscription, Mills, the secretary, inclosed forms, for the purpose of obtaining a valuation, as indicated, and two certificates, made by two different citizens of that community, of date February 16, 1911, were sent to the preliminary organization, placing a valuation of $17 per acre upon the 1,400 acres of land embraced in the first deed of trust. After the charter was obtained,

Mills continued to be the secretary of said corporation until some date in July, 1911. It is very inferable from the fact that Mills, who had nothing to do with Stuart, Harkrider & Co., was assuming duties and making requests of this particular subscriber, with reference to said securities. The date of the contract, with the subsequent date of these securities, with said contract and said securities in the possession of the corporation when chartered in March, 1911, and after the officers and directors had been elected, at least suggested to the corporation that securities had been executed which bore different dates of maturity of rather extended time, and that said subscriber was not intending at least during the life of the securities, to pay in cash for the stock. These facts apparent to the company, when obtaining the documents, were consistent with the intention of the parties in compliance with the alternative provision in the contract to pay in securities, and not in cash, at least during that period; whether you reject or admit the testimony as to what Mills did prior to the charter, as bearing upon intention.

I infer from Mills' testimony that a much larger per cent. of the stockholders gave notes in closing up their subscriptions than cash payment of stock. In testifying in regard to the mooted questions of loans (which at one time had very much bothered the company, on account of promises as to loans as well as on account of one of their own statements about loans, which they had presented to the stockholders), he said:

"The purpose was to take the stockholders' notes which were amply secured, and convert them into money from any source we could, in order to meet the stockholders' requirements. Where we could, we would negotiate the notes given for stock in the company and that would put cash into the treasury of the company."

Mills testified they did no business prior to the organization of the company and hence what notes were negotiated, given by subscribers for stock, were sold after incorporation.

These particular notes, under the first deed of trust, according to the valuation of the property, were amply secured. The second deed of trust, executed in December, 1912, was made subject to a mortgage in favor of one Darlington, for the sum of $10,000, placed upon property intervening the first and second mortgage.

Before this was done, and during the pendency of the previous notes, it is inferred that some effort was made to merge this particular company, in some manner, into another corporation called the Bankers' Guaranty Company. The record shows that an instrument of some character, with Hollifield's signature attached, providing for the sale of his stock, and authorizing B. F. Allen, Jr., to transfer the same and obtain other stock in lieu thereof in the guaranty company was testified about. Hollifield said:

"That is my signature there to the instrument, reciting that there was a sale made of 62½ shares of the capital stock of the Commonwealth Bonding & Casualty Insurance Company, represented by certificate No. 102, to the Bankers' Guaranty Company, and authorizing B. F. Allen, Jr., to transfer that stock."

He further said: "I returned the first stock I got to the Commonwealth, and they sent me this stock afterwards," meaning the stock evidenced by the transfer signed by him. This instrument was referred to Hollifield by defendant company's attorneys, on cross-examination, producing the above testimony. Hollifield testified that the certificate with the instrument, was returned, and that afterwards they sent the particular certificate in this record in place of the former stock. Further, on cross-examination, it is true, that he said "it seems like" that he got a certificate from the Bankers' Guaranty Company. However, his remembrance as to what he got being in apparent conflict with the instrument presented to him, which Hollifield was apparently summarizing, would not destroy the right of the trial court to conclude that the Commonwealth Bonding & Casualty Company actually sent Hollifield and issued certificate of stock in the Commonwealth Company. It is to be presumed that this act was after incorporation; otherwise, you would be required to infer that an attempt was made to transfer certificates in a corporation which had never been organized.

After the execution of the second series of notes, and the cancellation of the old paper, another and different certificate of stock, signed by Mills, was actually issued and delivered to Hollifield, the subscriber, and accepted by him.

It is not shown by any fact in this record, unless you were to infer from the delivery of the stock and the fact of valuation that the Insurance Department in reality approved any securities. The Insurance Department held up the permit to this corporation to do business in this state from some time in March, 1911, when the charter was issued, to the ——— day of June, of that year.

For appellant's benefit, I think it is true that when this subscription contract was executed it was contemplated that the proposed corporation would be organized under section 62 of the Insurance Code of 1909, now constituting article 4956 of the Revised Statutes of 1911.

Such state companies were permitted, under section 10 of the same act, now constituting article 4734 of the Revised Statutes, to invest their funds in "first liens upon real estate, the title to which is valid, and the value of which is double the amount loaned thereon," etc. And that article 4711, of the Revised Statutes, applicable to such companies, and relating particularly to the investment of capital stock, provided by the third clause that such capital stock may consist in mortgages upon unincumbered real estate in this state, the title to which is valid, of a market value double the amount loaned thereon," etc. It is troublesome, it is true, in analyzing the statutes with reference to foreign corporations in part doing an insurance business, just what jurisdiction the Commissioner of Banking and Insurance had and to what extent securities are embraced within his jurisdiction, under the law.

If the company switched its purpose to incorporate under the Texas laws (which would have required the approval of these securities), and then incorporated under the laws of a foreign state or territory, which might not require such approval, the inference, however, is deducible that some one approved these securities, and, if the company did so, the alternative provision of the contract in its spirit was followed. It attempted first, according to this record, to issue and actually deliver a certificate of stock, as an evidence of Hollifield's right in this incorporation, though for the purpose of transfer for other stock in another corporation. Thereafter it actually issued and delivered another certificate of stock to the subscriber, which was received by him and held until the institution of this suit.

With which of these two provisions, framed in the alternative, were these two parties intending to comply? One of them expressed an obligation by payment in money; the other by payment in approved securities.

"We recognize the rule that, in a case of doubt, courts should favor a construction which upholds the validity of the contract, but such a rule cannot apply to a case where the intent of the parties is obvious. A court cannot do violence to the plain meaning of words and the clear intent by making a contract for the parties, under the fiction of a construction." Scripps v. Sweeney, 160 Mich. 148, 125 N. W. 72.

The rule of preferred legality, as an arbitrary rule, I take it, is referable more to contracts ambiguous and susceptible to two constructions on their face.

The condition here is: The parties have a contract, one provision of which is valid, and the other void if paid by the securities signed by Hollifield. Thereafter they deal with reference to the contract, and as to its consummation. To which provision are their acts to be referred? To say that a court or a jury could not pass upon a question of this character as a question of fact, the same as any other issue, I am unable to concede.

"The terms 'money paid' are very definite and plain and do not mean that stock can be sold for money to be paid, but must be sold for cash." Irrigation Co. v. Deutschmann, 102 Tex. 207, 114 S. W. 1176.

"The terms in which this section of the Constitution is expressed indicates the purpose that the assets of the corporation should be something substantial and of such a character that they could be subjected to the payment of claims against the corporation as well as to secure the shareholders in their rights in the capital stock." Glass Co. v. Antiexplo Co., 101 Tex. 434, 108 S. W. 968, 16 L. R. A. (N. S.) 520, 130 Am. St. Rep. 865.

Here the corporation evidently intended to invest this subscriber with the rights of a full-fledged stockholder, in the first attempt to deliver, as well as in the last delivery of the stock. The Constitution, and the statutes thereunder, with reference to railroad securities, are complete, in preventing such stock and such securities from going into the hands of innocent purchasers upon insufficient security. Among the purposes evidently contemplated by the particular provision of the Constitution was to prevent the same thing as well as a protection to the creditors and the original stockholders, though incomplete. Where it is intended, as I believe the trial court had the right to infer from this record, viewing it as a whole, that the securities paid for the issuance and delivery of the stock, if the corporation is not insolvent and the rights of creditors have not intervened, such stock and such securities should be canceled.

This holding I do not consider in conflict with the Medlin Case, 180 S. W. 901, the Barrington Case, 180 S. W. 936, the Hill Case, 181 S. W. 219, lately decided, or any other case decided by this court. When the real basis of each of the different cases is analyzed, I can see no real contrariety.

Hence, "treating the * * * company as a foreign corporation, within the meaning of the article (1146, R. C. S. 1911), and it having been shown that the corporation was doing business in this state (when this stock was issued and delivered), the statute applied to it with full force, and prohibited the issuance of stock by it for the promissory note of the purchaser." Bank v. Falvey, 175 S. W. 836.

The Barrington Case cited, and the case of Cattlemen's Trust Co. v. Turner, 182 S. W. 438, lately decided by the Second Court of Appeals, and the Falvey Case, supra, are in accord upon the question of issuance and delivery; but the facts in each case insisted upon as showing delivery for the stock are clearly distinguishable from this case. I am not deciding this question upon conclusions of witnesses, but upon the acts of the parties, as evidencing which provision the parties were acting under.

Appellant contends that the securities canceled represent the surplus, and that the stock, on account of previous payments, has been actually paid for in cash. I think this position is wholly untenable. I am unable to see how logically and legally it can be said that because this defendant agreed to pay $2,500 for the stock (whatever its face value), and further agreed that a certain proportion paid, or agreed to be paid, would go to capital, and another proportion to surplus, that the whole amount the subscriber agreed to pay did not represent the consideration for the stock. Whatever the division of the proceeds realized upon the subscription, said proceeds were in consideration of the stock Hollifield agreed to buy. As a last analysis, he promised to pay said consideration for the stock; he did not purchase any certifi-

cates in a surplus fund; nor did he own any interest in that fund except through the medium of his stock, whatever its par value; nor did the corporation own that fund, except as a result of the purchase of the stock, which was the consideration the subscriber agreed to pay for said stock. If the $2,500 is the agreed consideration for the stock, and such stock should be void, it is wholly immaterial what agreement the parties may have made as to the disposition of the fund. Ordinarily, of course, the more surplus a corporation possesses, whether the result of subscriptions originally paid in, or thereafter earned, the stock is the representative of that surplus and is more or less valuable, in proportion to the amount of the surplus. The promise to pay $2,500 for the stock, though a part may go to surplus, I do not think divisible in a legal sense. Further, I understand it to be the invariable rule that:

"Where the agreement consists of one promise made upon several considerations (though I do not concede the consideration is even divisible in this promise) some of which are bad and some good, here, also, the promise is wholly void, for it is impossible to say whether the legal, or the illegal portion of the consideration, most affected the mind of the promisor, and induced his promise." Clark on Contracts, p. 473, and numerous cases cited.

I am unable to differentiate it in the contract as a legal proposition. I think the judgment should be affirmed.

HUFF, C. J. (dissenting). I am unable to assent to the affirmance of this case and respectfully dissent from the action of the majority of this court in doing so. My learned Brethren are very much at variance in giving the grounds for affirmance. One holds when the notes were executed the subscription contract or agreement was merged in the notes and that the evidence shows that they were executed upon an agreement to issue stock therefor. The other holds the subscription contract was accepted by the corporation when organized, and in effect that appellee had elected the alternative provision in his proposition to pay for the stock in securities satisfactory to the insurance department, and hence a payment in securities was made and therefore void. I cannot concur with either opinion filed. The subscription was made and delivered to the agents of appellee before the company was organized, and he executed the four notes, one for $687.50 and the three for $500 each, payable to his agents, the Organization Company, and secured these notes by a deed of trust on 2½ sections of land. All these instruments were in the hands of his agents before the incorporation of the company. The company was incorporated March 23, 1911, and granted a permit to do business in Texas in June, 1911. The Organization Company, the appellee's agent, indorsed the notes to appellant and turned over to it the subscription contract. After the company was incorporated and before the renewal of the three $500 notes,

with the interest added in, the appellee paid off to appellant the $687.50 note before he received the certificate of stock. Thereafter he renewed the three $500 notes and executed a deed of trust on the same land to secure them. These last notes and the deed of trust are the instruments sought to be canceled. These last notes are dated December 1, 1912, while the original notes are dated December 1, 1910, and the original deed of trust is dated January 13, 1911.

The appellee testified that the old notes were given "for stock in the Commonwealth Company." "These new notes which I executed are for the same consideration." "These three notes for the sum of $562.50 each, executed on December 1, 1912, were renewal notes of old ones." I find no evidence that there was a promise that the stock would be issued to him when the company organized. True, while testifying, he stated that he paid $2,500 for the certificate which he then held in his hand, and that he got nothing else for his money except the certificate; that he paid $1,000 in money and the three notes sought to be canceled, but he did not testify, as I construe the testimony, that the corporation promised to issue stock in payment or in consideration of those notes. The stock introduced in evidence was dated July 10, 1912, but in fact was not delivered to him until after he had paid the first note falling due and the renewal of the old notes in December, 1912. I am unable to find from this testimony anything warranting the inference that there was stock delivered to him prior to the one shown in evidence. There is some testimony that an agreement was prepared for him to sign, agreeing to transfer his stock in this company to another corporation, which was delivered to him, and which he refused to sign and return to the company. I do not interpret it as testimony showing that any stock was issued to him and delivered to him. The appellee's testimony on that point shows that he does not know what it really was, except that they sought to get a transfer of his stock in appellant to some other company.

I believe that the original contract of subscription, the original notes, and the deed of trust given to secure those notes, must be read together as part of his proposition to the proposed corporation to take stock in the company, when organized. When so read, his proposition to the corporation is, if it accepted his proposition to pay for 62½ shares of stock at $10 per share, $30 per share to the surplus, that he would pay this sum of money at a time certain; in other words, he agreed to pay his subscription by installments. This was not a promise to pay upon the issue of stock to him, but a promise to pay for the stock, and clearly implied that he would pay before issuance under the contract. Even without any statutory or constitutional inhibition, he could not have compelled the issuance of the stock before he

paid for it. California Hotel Co. v. Callender, 94 Cal. 120, 29 Pac. 859, 28 Am. St. Rep. 99. The contract being valid furnished a sufficient consideration for the new notes, and they were not therefore void. I quote from Ruling Case Law, vol. 7, "Corporations," § 193:

"A subscription by a number of persons to the stock of a corporation to be thereafter formed by them has in law a double character: First, it is a contract between the subscribers themselves to become stockholders without further act on their part, immediately upon the formation of a corporation. As such, the contract is binding and irrevocable from the date of the subscription, at least in the absence of fraud or mistake, unless canceled by consent of all the subscribers before acceptance by the corporation. Second, it is also in the nature of a continuing offer to the proposed corporation, which upon acceptance by it, after its formation, becomes as to each subscriber a contract between him and the corporation. The uniform postulate of all the adjudicated cases is that any subscription to stock in a corporation to be thereafter formed is not and cannot be from the very nature of the transaction, a complete contract—it is an open proposition—until the actual formation of the corporation; it is merely a continuing offer to take stock upon the condition that the corporation be called into existence and a fulfillment of which condition works at once without further act on the part of the subscriber an implied acceptance and concludes a binding contract. It is not essential to constitute one a subscriber to the capital stock of a corporation that he should have subscribed to the stock books after articles of incorporation have been perfected and filed. If there is a preliminary subscription and the corporation is thereafter formed as contemplated within a reasonable time, the subscribers become stockholders without any further act. Again, notice of acceptance by a corporation of a subscription for its benefit made before it was organized is not necessary. Such acceptance may be inferred from the conduct of the corporation retaining the subscription paper in its possession and expending large sums of money on the faith of it. * * * A promoter of a proposed corporation, who solicits and procures stock subscriptions, is the agent of the body of the subscribers to hold the subscriptions until the corporation is formed and then turn them over to it without any further act of delivery on the part of the subscribers. Hence a delivery of a subscription to such promoter is a complete delivery so that it becomes eo instante a binding contract as between the subscribers."

This, I believe to be the rule established in Texas. Belton Compress Co. v. Saunders, 70 Tex. 699, 6 S. W. 134; Steely v. Texas Improvement Co., 55 Tex. Civ. App. 463, 119 S. W. 319, 322, 323; Mathis v. Pridham, 1 Tex. Civ. App. 58, 20 S. W. 1015; Bivins v. Panhandle Packing Co., 140 S. W. 523.

The clause "pay in money or securities satisfactory to the insurance department" does not, in my judgment, render the proposition void; but if it, standing alone, did so, then before appellant accepted the proposition appellee had changed that part of it by his note to pay in cash upon a day certain and at all events. It was not a promise to pay if the stock was issued, and no such inference is legally inferable. The company could not issue the stock, and, if it afterwards did so, it was an ultra vires act, and the certificate

of stock was void and not an obligation upon the company for its par value. This stock could have been called in and canceled at any time by the company, or the Attorney General of the state could have instituted proceedings to that end. Articles 1147, 1148. I cannot see how this would render a valid note invalid. The purpose of the Constitution and law was to prevent the issuance of watered stock, not to declare illegal a contract to pay for stock. The contract did not require its issuance before paid for, and the subscription was not therefore illegal. Because the corporation, after accepting the note, did an illegal thing, this would not render the notes illegal when the illegal thing was not the consideration for the note. Contracts of this kind, as well as this very contract, have been upheld as legal by the courts, and I see no reason for holding differently in this case.

Considering the proposition, notes, and deed of trust as one instrument, it was unambiguous in that it was a promise to pay cash for the stock. The rule is so well recognized by all the courts that an agreement to pay for stock by subscribers may be enforced after organization of the proposed corporation, that I deem it unnecessary to cite further authorities. The appellee's interpretation that the certificate was to be issued to him in consideration of his note and subscription in my judgment is not warranted by his written contract and proposition.

I am also unable to agree on the proposition that the facts in this case do not show a payment for the stock before its issuance. I believe the facts show that it was paid for before there was any stock delivered to Hollifield. The subscription contract divides the amount subscribed into stock, the shares of which were to be of the par value of $10; the surplus should be $30. The expenses of organization were deducted from the $2,500 paid by appellee to his agent at the time of subscribing. He expressly stipulates in his contract that the amounts subscribed should go to capital stock and surplus. He, himself, made the division. He stated that his shares should be $10 each, and that his surplus should be $30 each, and, having made the division himself, he should not now be heard to say that he paid $2,500 for the shares. The contract was that he agreed to pay when the capital stock had been subscribed in good faith to the amount of $200,000 of capital in the aggregate when paid. It makes no difference whether the value was placed on them at $1 or $10 per share; the capital stock was $200,000. And the surplus was to be $30 per share, which would have been $600,000 in addition to the capital stock. This, I believe, to be the interpretation of this contract. The charter of the corporation provides that its shares shall be divided into 30,000 shares at $10 each, and the stock issued in this case shows that it was issued at $10 per share—62½ shares at $10 per share. It occurs to me that there must be some confusion with reference to what constitutes capital stock, or the shares of stock owned by the individual. Cook on Corporations, vol. 1, § 8, defines "capital stock" as:

"The sum fixed by corporate charter as the amount paid or to be paid in by the stockholders for the prosecution of the business of the corporation and for the benefit of corporate creditors. The capital stock is to be clearly distinguished from the amount of property possessed by the corporation."

Again, he says in the same section:

"The capital stock of a corporation remains fixed, although the actual property of the corporation may fluctuate widely in value and may be diminished by losses or increased by gains. The term 'stock' has been used at times to indicate the same as capital stock. Generally, however, it means shares of stock and in this sense it is used in this treatise."

The United States Supreme Court and the federal courts, in cases arising on the question of taxation with reference to stock and surplus as to whether or not surplus fell under the term stock, have drawn the distinction between "stock" and "surplus," and hold that the surplus is subject to the taxation. In Leather Manufacturers' Bank v. Treat, 128 Fed. page 262, 62 C. C. A. 644, in discussing this question it is said:

"It is quite usual, upon the organization of financial corporations, for the stockholders to contribute, besides the share of capital, a fund which is known as 'surplus.' It is also quite usual for the directors or managers of these institutions to set apart and to add to this fund from time to time some part of the accumulated profits of the business in excess of dividend requirements. The fund produced in either of these ways is what is known as 'surplus.'" Central Trust Company of New York v. Treat (C. C.) 171 Fed. 301.

The ownership of this large surplus by the corporation, available to make good losses in any of its enterprises, would naturally increase its credit generally.

The Supreme Court of the United States, in Bank of Commerce v. State of Tennessee, 161 U. S. 134, 16 Sup. Ct. 456, 40 L. Ed. page 645, in discussing the taxes which may be collected against a banking corporation, uses this language:

"The surplus belonging to this bank is 'corporate property,' and is distinct from the capital stock in the hands of the corporation. The exemption, in terms, is upon the payment of an annual tax of one-half of one per cent. upon each share of the capital stock, which shall be in lieu of all other taxes. * * * Recognizing, as we do, that there is a different property in that which is described as capital stock from that which is described as corporate property other than capital stock, and remembering the necessity there is for a clear expression of the intention to exempt before the exemption will be granted, we must hold that the surplus has not been granted exemption by the clause contained in the charter under discussion. The very name of surplus implies a difference. There is capital stock and there is a surplus over, above, and beyond the capital stock, which surplus is the property of the bank until it is divided among stockholders."

Ruling Case Law, vol. 7, in section 165, defines "capital stock," and in section 160 says:

"The tangible property of a corporation and the shares of stock therein are separate and distinct kinds of property and belong to different owners. The first being the property of the artificial person, the corporation; the latter the property of the individual owner."

The Constitution in this state forbids the issuance of "stock" without money paid. Until issued, the capital stock is in the corporation. After issued, when delivered, it becomes the property of the individual, and not before. It is not an obligation on the part of the corporation to pay to the individual the amount represented by the shares. Stock issued and delivered as fully paid up, if in the hands of an innocent third party, could be enforced against the corporation. Hence the evident purpose of the framers of the Constitution and of the law was to prohibit the issuance and delivery of stock as fully paid up. The capital stock in appellant company could be issued to the amount of $300,000 of the par value of $10. It will not be contended, we apprehend, that it could have issued stock for $300,000 plus the surplus. The obligation on the part of the corporation was only for $10 per share, and there was no other outstanding obligation against it represented by that certificate, and this was the obligation which is prohibited from being issued by the Constitution. There is no provision in the law or Constitution that prohibits an individual stockholder from contributing to the corporation a sum of money independent of the shares of stock for the purpose of making the assets of the corporation more valuable. Such an obligation or such a note could not violate the law or Constitution, for the reason that the public, in dealing with it, had the assurance, not only that the stock is paid, but that, in addition thereto, there is $30 per share over and above the stock, and public policy would not prohibit, it occurs to me, a corporation from making its stock more valuable and its customers better secured by this addition than it otherwise would be by the mere payment of the par value of the stock. We apprehend that it will not be contended that under articles 1198, 1208, and 1210, the shareholder, in case a creditor should desire to collect a debt against the corporation, could collect from the shareholder more than the face value or par value of his stock; or, in case of insolvency, that he would be assessed for more than his pro rata part as shown by the face or par value of his stock. I believe that when this note was paid, and it having been paid before the issuance or delivery of the stock to the appellee, that the par value of the stock was paid for, and that the Constitution and law of Texas were satisfied, and that he was entitled to his certificate of stock. By that certificate the

company did not represent to the world that it was fully paid up when it was not, for in fact it received the par value of the stock and had the money on hand. The other notes for $1,500, with the accrued interest, was not for stock, but it was for something over and above the stock which he had agreed to pay as surplus, as was shown by his written proposition, and it was not in violation of the Constitution and laws for him to so execute such notes. It made the corpus of the corporation more valuable and should be commended, rather than condemned. I therefore am of the opinion that this case should have been reversed.

---

⚶⟿For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes